JOANNE MASINGILL *vs.* EMC CORPORATION & others.[1]

Worcester. April 3, 2007. - July 20, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Contract,* Misrepresentation, Employment. *Fraud. Practice, Civil,* Judgment notwithstanding the verdict, Disqualification of judge. *Judge.*

In the circumstances of an action for intentional misrepresentation in which the plaintiff, a sophisticated business person who had negotiated her written employment contract with her employer, asserted that her contract failed to provide her with certain benefits that the employer had promised, the judge correctly instructed the jury that it was unreasonable, as a matter of law, to rely on prior oral representations that were specifically contradicted by the terms of a written contract. [540-543]

In a civil action alleging multiple claims for intentional misrepresentation, the judge erred in failing to enter judgment notwithstanding the verdict in favor of the defendants on the one misrepresentation claim on which the jury found for the plaintiff, where none of the alleged misrepresentations presented to the jury could, as a matter of law, support such a verdict. [543-546]

The judge in a civil action did not abuse his discretion in denying the plaintiff's motion for recusal, where nothing in the judge's prior contacts with the defendant company suggested any basis for a suspicion of bias on his part, and where the judge was wholly uninvolved in the events surrounding the case's transfer to his session. [546-549]

CIVIL ACTION commenced in the Superior Court Department on May 11, 2001.

The case was tried before *Thomas P. Billings,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*George L. Dresser* (*Roy A. Bourgeois* with him) for the plaintiff.

*Joan A. Lukey* (*Amanda P. Masselam* with her) for the defendants.

CORDY, J. The plaintiff, Joanne Masingill, brought suit against

---

[1] Data General Corporation, Ronald L. Skates, and Joel Schwartz.

her former employer, Data General Corporation (Data General or company), which, after her hiring, was acquired by the defendant EMC Corporation (EMC). She alleged that the defendants Ronald L. Skates, the chief executive officer of Data General, and Joel Schwartz, its senior vice-president, had, in the course of negotiations about the terms of her employment with Data General, made certain representations about benefits she would receive were the company to be sold. None of these terms appeared in her written employment agreement. When Data General was sold to EMC, Masingill did not receive the benefits she asserted had been promised. Masingill's claims of intentional misrepresentation were tried to a jury, which returned verdicts largely in favor of the defendants.

On appeal, Masingill challenges the jury instructions, claiming that they in effect directed a verdict for the defendants. She also argues that the trial judge should have allowed her motion to recuse himself. That motion came after the case was moved from one trial session to another in circumstances Masingill argues undermine the presumption of impartiality. The defendants cross-appeal from the judgment on the one misrepresentation claim on which the jury found for Masingill, arguing that the judge should have entered judgment notwithstanding the verdict (judgment n.o.v.). We agree that judgment n.o.v. should have been entered on this claim. Otherwise, we affirm.

1. *Background.* The evidence at trial was as follows. Masingill's first contact with Data General came through an executive recruiter, Debra Germaine, who had been hired to identify and recruit candidates for the position of vice-president of marketing in the company's CLARiiON division.[2] Schwartz had been put in charge of that division in the fall of 1997, and by mid-1998 was developing a plan to expand its business. The marketing position was an integral part of that plan. At the time she was recruited, Masingill worked for Compaq, which had recently acquired her previous employer, Microcom. Masingill was displeased that, when Microcom was acquired by Compaq, she had lost her position as a corporate vice-president and the

---

[2] The CLARiiON division of Data General was primarily in the business of making storage devices for computers.

only offer forthcoming to remain at Compaq was as a program manager.

Germaine contacted Masingill about the position at Data General in August, 1998. While Germaine ultimately provided Schwartz with a number of resumes, Masingill was the only candidate interviewed. Schwartz began speaking with Masingill in late September, 1998. He had a positive impression of her and arranged for her to meet with a number of other people at Data General. In order to facilitate a possible offer, Masingill purported to share details of her position at Compaq, telling Schwartz that she held the position of vice-president[3] at Compaq and was paid over $200,000 a year. She also told him that, were she to leave Compaq before the end of the year, she would forfeit a guaranteed bonus of $70,000 and a number of valuable stock options.[4]

Masingill's first and only face-to-face meeting with Skates took place in his office on November 9, 1998. Masingill asked Skates about rumors that Data General was a takeover target. She testified that Skates told her that Data General was not for sale. This was important to Masingill because she did not want to go through another acquisition process. Skates, in contrast, testified that he told Masingill that while there were no offers to buy the company "on the table," Data General was "always for sale" for a reasonable price.[5] He also testified that, before the time of Masingill's interview, he had spoken with several other companies about possible investments in Data General, business combinations, or acquisitions. When he met with Masingill, however,

[3]By the time Schwartz spoke with Masingill, she did not hold the position or title of vice-president at Compaq; however, she held herself out as such to Schwartz and the others at Data General throughout the interview process. In her testimony, Masingill accounted for this discrepancy by pointing out that, at the time she gave Germaine a resume indicating that she was a vice-president, she still held that title.

[4]Ultimately, Data General would offer Masingill a signing bonus of $70,000 to compensate her for the loss of this bonus. Masingill was, however, not guaranteed this amount by Compaq as she had said. She ultimately was given a bonus of $19,000 by Compaq, which was paid to her as part of her severance agreement with that company. She did not tell Data General about this payment.

[5]Skates testified that the statements he made to Masingill were similar to those made to any applicant who asked about a possible corporate sale. This answer had been developed in order to balance two competing concerns: speaking honestly with applicants while preventing the release of any inside information.

none of these negotiations was active, and there were no present or imminent offers. Masingill testified that she believed Skates's statement that the company was not for sale, and would not have gone to work for Data General had she in fact known there were ongoing discussions to sell the company.

The conversation then turned to the protections Masingill desired in the event of a takeover. Her primary concern was that she be given forward vesting of stock options — that is, that any unvested stock options would vest immediately on a change in control. Skates told her that this was "impossible" because it was part of a "full chute."[6] Those hired for jobs at the vice-president level were ordinarily not offered this benefit at Data General unless their position made them a corporate officer. The position for which Masingill was interviewing would not make her such an officer, and Skates testified that he told her so during the meeting. He also told her that the board of directors would not approve a full chute for her as part of an initial offer.[7] Nevertheless, Masingill testified that Skates told her that he would "see that [she would] get a full chute during [her] first year" at Data General.

Masingill testified that she did not know any particulars about the terms of a "full chute" at Data General other than that it included forward vesting of stock options. Masingill therefore asked what would happen should the company be acquired before the end of her first year. Skates (according to Masingill) told her that he would "take care of [me]." She "understood that to mean that if for any reason he was not able to give me the chute before the company was acquired then he would in fact see that I got the chute in any case."[8] Skates testified that he made no particular promises to Masingill during this meeting other than a commitment to give her the usual annual review. These reviews involved possible raises and other benefits, including a "chute," depending on performance.

---

[6]In business parlance, the term "chute" refers to a "golden parachute," which is benefits, usually in cash and stock, granted to executives who leave a company.

[7]Richard Maunder, director of executive staffing at Data General, confirmed to Masingill what Skates had told her, i.e., that a "chute" was not available to her because she would not be a corporate officer.

[8]Germaine also testified that Skates made similar statements to her about Masingill, i.e., that although he could not put a chute in writing, he would "take care of her."

After the meeting with Skates, Masingill's negotiations with Data General began in earnest. Her primary contact in that process was Schwartz, although she also spoke with personnel from Data General's human resources staff. Germaine would often serve as an "intermediary," as Masingill put it. Schwartz described Masingill as a "tougher negotiator" than most, who had "many specific requests of both a major significance and a minor significance." Schwartz testified that Masingill would bring up her desire for a "chute" in each discussion they would have, but that he consistently told her that only Skates could suggest that benefit to the board of directors. Schwartz did not believe that Masingill warranted a chute, and did not press Skates to support this benefit.

According to Germaine, Schwartz told her (presuming that she would then tell Masingill) that he would ask Skates about a written "chute" for Masingill. Later, though, he told Germaine that Skates would not approve putting in writing a chute for Masingill. Germaine further testified that when she asked Skates about this, he explained that giving Masingill a written chute would anger some other executives who did not have that benefit; but that Masingill could expect the chute in writing after one year. Germaine also testified that Skates told her that, if the company were sold before one year, he would "take care of her." He made no guarantee that the company would not be sold.

Masingill received a formal offer letter from Data General on November 19, 1998. It provided for a base annual salary of $225,000 and a signing bonus of $70,000. It also included a significant grant of stock options. There was, however, no allowance for any salary continuation or immediate vesting of options on a change of control. Masingill and Germaine then contacted Schwartz to say that this was unacceptable because "[s]he wanted a chute." Data General then presented Masingill with a "contract addendum," which Schwartz had read and approved. It modified the previous offer by granting Masingill a salary continuation of one year in the event of her termination due to a change of control. There was no mention of stock option vesting.

The contract addendum was dated November 24, 1998. On that same day, Masingill and Schwartz met together for breakfast. She testified that she was "disappointed" that the addendum was

not more favorable to her, but that Schwartz "basically said he was sorry that they couldn't do anything more, the offer stood the way it was," without a chute.[9] Schwartz and Masingill did discuss the possibility that she would receive a six-month review. She testified that he said, "I will commit to give you a six-month review to address these issues and to make you whole."[10] Schwartz testified to telling Masingill that he "would be willing to do a six-month performance review," but that any changes he could make would only be in cash compensation[11] and would have to be based on "outstanding" performance.[12] Masingill also asked for an increase in the number of stock options she would be granted. She thought such an increase in stock options would be included in the commitment to "make [her] whole."

The next day Masingill received a further revision to the offer letter. The modifications in the second addendum included changes to Masingill's insurance coverage and participation in the company pension plan (not stock options plan), and offered to pay for a home computer and Internet connection. The addendum did not mention a review or stock option vesting. Masingill signed the original letter and both addenda on December 2, 1998. She began work at Data General in early January, 1999.[13]

In August, 1999, eight months into her tenure at Data General, Masingill learned that the company would be acquired by EMC. She arranged a meeting with Skates to discuss "his commitment to me." The two discussed her desire to receive the benefits of a chute. Skates testified that he was "surprised at the conversation because I had been quite emphatic with Miss Mas-

---

[9]Schwartz gave a similar account of his statements at the breakfast meeting on November 25, 1998: "I told her that we had given her the best offer, that I was very interested in having her come work for us," but that "what she had to accept was what we had given her already."

[10]Germaine also testified that Schwartz told her that Masingill would receive a performance review six months into her tenure.

[11]Only the board of directors, on suggestion of Skates, could approve changes to her stock option grants or vesting schedule.

[12]Schwartz did complete an evaluation of Masingill in late August, 1999, giving her an over-all rating of "exceeds expectations," one level below "outstanding."

[13]Masingill's official start date, when she registered for payroll and insurance, was December 21, 1998. She was then given three weeks of vacation and actually began work in January.

ingill both about the fact that we wouldn't give her more than seventy thousand dollars [in bonus] and that we would only give her the one year [of salary continuation]." He further testified that in the meeting Masingill said "no" to his direct question whether he had promised her anything other than what was in her written contract. Masingill testified that Skates was "agitated and angry" at the meeting, and that he told her that if the acquisition "had happened in October you would have your chute and you wouldn't be mad at me now."

Masingill tried to find an appropriate job within EMC after the acquisition, and was assisted in this effort by Schwartz. Ultimately, though, the search proved fruitless and Masingill left EMC on December 31, 1999. On January 3, 2000, she wrote to Schwartz and Erin Motameni, EMC's vice-president for human resources. In her letter, Masingill expressed her belief that she had been promised a "full chute" if and when she lost her job as a result of a change in control. She asked that as part of her severance she be given three years of salary continuation and forward vesting of her stock options, along with "[a]ll other agreements documented in my offer letter of November 1998."[14] Motameni sent her a severance offer on January 13, 2000. It included some enhancements to her original agreement,[15] but did not offer forward vesting of stock options or salary continuation beyond one year. Masingill did not sign the letter, and so was paid severance according to the terms of the offer letter she signed originally.

2. *Procedural history.* Masingill commenced this action on May 11, 2001. Her complaint alleged breach of contract, promissory estoppel, and breach of the implied covenant of good faith

---

[14]The three years of pay and forward vesting that Masingill requested were the key elements of the "full chute" offered to Skates and other senior officers of Data General.

[15]The primary changes in EMC's severance offer of January 13, 2000, were continuation of insurance coverage and a change in lump-sum payout of salary continuation. Under the original agreement, if Masingill were to take a new job during the one year of severance, she would receive a lump-sum payment of fifty per cent of the remaining payments at the time her new job commenced. The severance offer increased that payout amount to seventy-five per cent in the event Masingill took another job soon after leaving EMC. She did not accept the new severance offer, resulting in a lump-sum payment of approximately $50,000 less than it would otherwise have been.

and fair dealing against Data General and EMC. These claims were based on Masingill's assertion that she was owed a full chute, a six-month review, forward vesting of her options, and additional stock. Masingill also alleged intentional misrepresentation and fraudulent inducement against Skates, based on his statements about the likelihood of a takeover of Data General, and that she would be "taken care of" in such an event.[16] She further claimed that Skates had misrepresented to her that she would receive a "full chute" and forward vesting. Masingill's complaint made similar claims of intentional misrepresentation and fraudulent inducement against Schwartz. These were based on Schwartz's statements that Masingill would be "made whole" if she left Compaq, that she would receive a six-month review, and that her salary and stock options would be increased. The alleged misrepresentations and inducements were also imputed to Data General and EMC, as they were made by Skates and Schwartz in their official capacities as corporate officers. The defendants answered by denying all charges and asserting affirmative defenses.[17] After the discovery period, a motion by the defendants for summary judgment was denied on June 19, 2003.

At the conclusion of a two-week trial, the jury returned their verdicts. These were in the form of special questions related to the claims of intentional misrepresentation and fraudulent inducement.[18] The jury found that Skates knowingly and recklessly made false statements to Masingill about the sale of Data General and about whether she would receive a "chute," but that any reliance by her on such statements was not reasonable. The jury also found that Schwartz had made "false statement(s) of material fact" to Masingill, and that she had reasonably relied on those

[16] The complaint specified Skates's alleged fraudulent misrepresentations to Masingill in compliance with the requirement in Mass. R. Civ. P. 9 (b), 365 Mass. 751 (1974), that fraud be pleaded with particularity. The complaint similarly specified alleged misrepresentations made by Schwartz.

[17] The defendants filed their answer in the United States District Court for the District of Massachusetts, having filed a notice of removal in the Superior Court on July 3, 2001. The case was remanded to the Superior Court from the Federal court on August 8, 2001.

[18] The parties stipulated to the dismissal of the contract and promissory estoppel claims.

statements.[19] They awarded damages to Masingill in the amount
of $37,000 based on that reliance. Judgment entered accordingly.

Both parties then filed posttrial motions, the defendants asking
for judgment n.o.v. against Schwartz, and the plaintiff asking for
a new trial. Both motions were denied, and this appeal followed.
We transferred the case from the Appeals Court on our own
motion.

On appeal, Masingill argues that the jury instructions on
reasonable reliance were in error, and effectively directed a
verdict for the defendants.[20] She also objects to the denial of her
motion for recusal. We reject both claims. In their cross appeal,
the defendants argue that it was error for the judge to deny their
motion for judgment n.o.v. We agree, and accordingly order
judgment for the defendants.

3. *Misrepresentation.* To recover for fraudulent misrepresenta-
tion, a plaintiff "must allege and prove that the defendant made
a false representation of a material fact with knowledge of its
falsity for the purpose of inducing the plaintiff to act thereon,
and that the plaintiff relied upon the representation as true and
acted upon it to [her] damage." *Kilroy* v. *Barron*, 326 Mass.
464, 465 (1950), and cases cited. Such reliance by the plaintiff
must be reasonable. See *Kuwaiti Danish Computer Co.* v. *Digital
Equip. Corp.*, 438 Mass. 459, 467 (2003) (*Kuwaiti Danish*)
(discussing when reliance justified). Cf. Restatement (Second)
of Torts § 537(b) (1977) (recovery for fraudulent misrepresenta-

[19]In contrast to the questions about Skates, the special verdict form did not
list specific alleged misrepresentations by Schwartz.

[20]Technically, the parties have taken appeals from the denials of their posttrial
motions. This encompasses an effective appeal from the underlying judgment.
*Foman* v. *Davis*, 371 U.S. 178, 181-182 (1962). See *Forte* v. *Muzi Motors, Inc.*,
5 Mass. App. Ct. 700, 701 n.4 (1977) (appeal from motion for new trial pursu-
ant to Mass. R. Civ. P. 59, 365 Mass. 827 [1974], constitutes appeal from
underlying judgment). A judge's decision on a motion for a new trial is reviewed
for abuse of discretion. *Poly* v. *Moylan*, 423 Mass. 141, 150 (1996), cert. denied
sub nom. *Poly* v. *Cargill*, 519 U.S. 1114 (1997). Here, though, our review is, in
effect, of the underlying jury instructions. We therefore apply the two-part test
applicable in a review of jury instructions: whether the instructions were legally
erroneous, and (if so) whether that error was prejudicial. *Blackstone* v. *Cash-
man*, 448 Mass. 255, 270 (2007), citing Mass. R. Civ. P. 61, 365 Mass. 829
(1974). Because we find no legal error in the instructions here, we do not reach
the question of prejudice.

tion only if reliance "justifiable"). In his charge, the judge instructed the jury on reasonable reliance as follows:

> "Where the contract was fully negotiated and voluntarily signed, then a plaintiff may not raise as fraudulent or as a misrepresentation any prior oral, spoken assertion that's inconsistent with the written contract provision that specifically addressed a particular point at issue. . . . A reasonable person would not, could not, rely on oral assurances or promises that were flatly contradictory to the provisions of the written contract. That would not be reasonable reliance. . . . It may be a question of fact for you to determine whether a particular oral statement or representation flatly contradicts a written contract provision or not, but, if it does, then her reliance could not be reasonable and it could not be the sort of misrepresentation that would form the basis of a claim for misrepresentation."

Masingill argues that this instruction "incorrectly stated that it is unreasonable as a matter of law for a plaintiff to rely on an oral misrepresentation that is inconsistent with the terms of a written contract."

Masingill's argument has no merit. It is unreasonable as a matter of law to rely on prior oral representations that are (as a matter of fact) specifically contradicted by the terms of a written contract. This is a rule of long standing, which we most recently reaffirmed in *Kuwaiti Danish, supra* at 467-469. As we have said, "if 'the contract was fully negotiated and voluntarily signed, [then] plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue.' " *Starr* v. *Fordham,* 420 Mass. 178, 188 (1995), quoting *Turner* v. *Johnson & Johnson,* 809 F.2d 90, 97 (1st Cir. 1986) (*Turner*). The judge's instructions were taken almost directly from the language in *Starr* v. *Fordham, supra,* and they correctly stated the law.

Masingill notes that a written contract has not been an absolute bar to a misrepresentation claim. She cites in support the only recent case where this court has upheld a misrepresentation claim in the face of a written contract, *McEvoy Travel Bur., Inc.* v. *Norton Co.,* 408 Mass. 704 (1990) (*McEvoy*). In *McEvoy,* the parties had a thirty-year relationship whereby the plaintiff

provided travel services to the defendant. When asked by the defendant to be its exclusive agent and to move its offices to the defendant's location, the plaintiff did so, at considerable expense. All of this was done without any written contract. Later the defendant produced a written contract purporting to memorialize their oral agreement, which the plaintiff was asked to execute. The contract contained a clause allowing the defendant to terminate the arrangement on sixty days' notice. The plaintiff objected to the clause and refused to sign the contract. To induce the plaintiff to sign, the defendant then assured the plaintiff that the clause was "meaningless" and "inoperative." Three years later the defendant invoked the termination clause. The plaintiff sued for fraud. *Id.* at 706-709.

*McEvoy* is readily distinguishable from the present case. In that case, the defendant had induced the signing of the contract by affirmatively disclaiming written provisions in the contract at the time of its execution. The written contract was itself a modification and memorialization of a long-standing preexisting oral contractual relationship, rather than the culmination of a process of arm's-length bargaining. In the present case, we have provisions sought and discussed, but ultimately not part of the final offer. The alleged misrepresentations about which Masingill complains were made "during the 'give-and-take of negotiations,' before any final commitment or agreement [was] made." *McEvoy, supra* at 710, quoting *Turner, supra* at 96. Masingill testified that when she received a written contract without the full protections she wanted, Schwartz "basically said he was sorry that they couldn't do anything more, the offer stood the way it was." In other words, Masingill signed her contract knowing that she had not received all of the terms she wanted. In such circumstances, she cannot later raise the content of negotiations "to contradict what is finally and unequivocally agreed upon in the final version of the contract," without creating the (legally unacceptable) result that "the language of the contract simply would not matter any more." *McEvoy, supra* at 710-711, quoting *Turner, supra* at 96.

Masingill makes much of the fact that she did not know that the "full chute" held by Skates and other senior executives provided for forward vesting of stock options and three years of

salary continuation (as compared to the one year of continuation she had sought). Her lack of knowledge on that point is irrelevant. Masingill's discussions with Skates and Schwartz about a "chute" were mutually understood to focus on forward vesting of stock options. There was no evidence of any discussion of salary continuation beyond the one-year provision that appeared in her contract. Thus, for purposes of analyzing any misrepresentation, we find the relevant comparison to be between what Masingill was seeking and what she thought she was promised by the term "full chute" (forward vesting), not what others had in their "chute" packages. Even if it were relevant that the "full chute" enjoyed by Skates was better than what Masingill thought was in a "full chute," she still knew when she signed her contract that it did not provide her with the benefits of a full chute.[21]

In sum, the evidence presented Masingill as a sophisticated business person who negotiated her contract with the defendants tenaciously, and with great attention to detail. By the time Masingill signed her contract, she knew she was not getting everything she wanted. She admitted as much on the stand. The jury were properly instructed on reasonable reliance in these circumstances. There was no basis for the judge to grant a new trial.

4. *Cross appeal.* Schwartz and EMC appeal from the judge's denial of their motion for judgment n.o.v. on the misrepresentation claim against Schwartz.[22] Our review of a defendant's motion for judgment n.o.v. asks "whether, 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.' " *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972), quoting *Kelly* v. *Railway Express Agency, Inc.*, 315 Mass. 301, 302 (1943).

---

[21]Masingill claims in her brief that the employment agreement's silence with respect to forward vesting and a "full chute" was "[c]onsistent with Skates's representations . . . ." Insofar as this is intended to imply that Masingill signed her contract in the belief that forward vesting and a "full chute" were part of the agreement, it is contradicted by her own testimony that "the offer stood the way it was."

[22]EMC, as Schwartz's employer, admits its liability on any judgment on this claim because Schwartz made all of the alleged misrepresentations in furtherance of his duties to EMC.

The verdict form did not (as it did with the claim against Skates) list any claimed misrepresentations separately. Rather, it simply asked, "Did the defendant, Joel Schwartz, knowingly or recklessly make a false statement(s) of material fact to the plaintiff, Joanne Masingill, intending that she rely upon it?" The jury answered "Yes" to that question.[23] In their briefs, the parties have suggested that three alleged misrepresentations were presented to the jury on which they could have based their finding. Those alleged misrepresentations were (1) that Schwartz promised that Masingill would be "made whole" at a six-month review; (2) that, as Masingill was told by Germaine, Schwartz "went to bat" for her with Skates in an attempt to get her a "full chute"; and (3) that Schwartz promised Masingill a guaranteed annual performance bonus for fiscal year 1999. The defendants contend that none of these representations can, as a matter of law, support the verdict. We agree.

We first consider the representation that Masingill would be "made whole" at a six-month review. Presuming, as we must, that this statement was false and material, and that Masingill relied on it to her detriment, see *Kilroy* v. *Barron*, 326 Mass. 464, 465 (1950) (elements of fraudulent misrepresentation), we still find the statement too vague to support the cause of action. The evidence does not offer any definition or further explanation of the term "make you whole" sufficiently precise to determine what the representation meant.[24] See *Hogan* v. *Riemer*, 35 Mass. App. Ct. 360, 365 (1993) (vague "[s]tatements of expectation" do not support cause of action for fraud). Insofar as it meant any specific benefit or group of benefits Masingill sought, it was contradicted by the written contract and could not, therefore, be relied on reasonably. *Starr* v. *Fordham*, 420 Mass. 178, 188

---

[23]The next question on the special verdict form asked, "Did the plaintiff, Joanne Masingill, reasonably rely on such false statement and suffer financial loss as a result?" The jury answered "Yes" to that question.

[24]This is demonstrated by an exchange during the cross-examination of Masingill:

> DEFENSE COUNSEL: "In any event, what Mr. Schwartz said to you was that he would make you whole, but he never told you what he meant, did he?"

> THE PLAINTIFF: "No."

(1995). The promise of a "review" after six months[25] was similarly vague. This is not because the fact of a review was vague: Masingill may have believed that Schwartz was committing to do such a review at a specific time. Rather, the vagueness comes in the total lack of obligation to provide any benefit to Masingill as a result of such a review. Schwartz might as easily have determined in such a review that Masingill's performance merited termination as he might have used it as an opportunity to offer her a cash bonus, or simply to compliment and encourage her. Further, any construction of the promise of a review to mean a specific benefit such as a cash bonus would have been (as with the promise to "make whole") directly contradicted by the contract.

The second alleged misrepresentation, that Schwartz "went to bat" for Masingill by asking Skates to grant her a "full chute," was not alleged in the complaint. Nor was there any subsequent motion to amend the complaint to add this specific misrepresentation. Fraud must be pleaded with particularity. Mass. R. Civ. P. 9 (b), 365 Mass. 751 (1974). See *Tetrault* v. *Mahoney, Hawkes & Goldings*, 425 Mass. 456, 463 n.7 (1997) (court will not consider averments of fraud not pleaded with particularity). In these circumstances, this alleged misrepresentation cannot support the verdict against Schwartz.[26] We need not reach the question whether reliance on this statement could have been reasonable, or whether this statement was too vague to support a claim for misrepresentation.

The third alleged misrepresentation, that Schwartz promised

---

[25]For purposes of this analysis, we do not consider the review that Schwartz completed at the end of August, 1998, to be the one promised. Because Masingill started at Data General in January of that year, a six-month review would have occurred in June.

[26]The first time this statement was mentioned as a possible basis for the misrepresentation claim was in Masingill's counsel's oral argument against the defendants' motion for a directed verdict. Masingill contends that the defendants were in any case not prejudiced by her failure to plead this particular statement as an instance of a misrepresentation. This is irrelevant. The alleged misrepresentation cannot support the verdict here because of Masingill's failure to satisfy rule 9 (b) with respect to it. Prejudice is a standard used in evaluating a motion to amend a complaint. See *Hamed* v. *Fadili*, 408 Mass. 100, 105 (1990). Here, we do not reach the question of prejudice because there was never any motion to amend to add this misrepresentation to the complaint.

Masingill a guaranteed bonus, was made to Germaine with the intent that she tell Masingill.[27] As with the second alleged misrepresentation, Masingill failed to plead this particular misrepresentation in her complaint. Nor did she subsequently move to amend the pleadings to add it. Consequently, this alleged misrepresentation also cannot support the verdict for failure to satisfy rule 9 (b). Even if Masingill had pleaded it properly, any statements Schwartz made about a guaranteed bonus for Masingill were contradicted by her written contract, which provided not for a specific, guaranteed bonus, but for a bonus "targeted at [thirty-five per cent] of your base pay." Masingill could not, as a matter of law, have reasonably relied on prior oral statements by Schwartz about her bonus in deciding to sign the contract offered by Data General.

In sum, none of the alleged misrepresentations made by Schwartz can support the verdict against him. The judge should have granted judgment n.o.v. on the count against Schwartz.

5. *Motion for recusal.* The case was set down for trial in the "A" session of the Superior Court in Worcester County, with an anticipated start date sometime in mid-April, 2004. On March 30, 2004, counsel were informed that the case had been moved to the "C" session on a "first case out" basis, meaning that it would be tried before all other matters on the docket in that session. Neither party had requested the change of session. The effect was to move the trial date forward by approximately nine days.[28] The judge in the "A" session had managed discovery and pretrial conferences in the case, while the judge in the "C" session was the judge who had denied the earlier motion for summary judgment filed by the defendants.

Masingill's counsel soon discovered that the move had oc-

---

[27]Germaine testified to this exchange on direct examination:

> PLAINTIFF'S COUNSEL: "And what do you recall Mr. Schwartz telling you about that bonus plan in terms of the likelihood of it being paid?"

> THE WITNESS: "The likelihood was a hundred per cent because historically it was paid out and paid out at such a much higher level, so instead of thirty-five per cent many people received seventy per cent or a hundred per cent or whatever and [he] shared some examples on individuals."

[28]Neither party suggested that it was prejudiced by the earlier start date.

curred at the direction of the then Chief Justice of the Superior Court Department. He informed defense counsel, whose investigations provided further information.[29] From speaking with the general counsel at EMC, defense counsel learned that the then Chief Justice of the Superior Court served together with the general counsel of EMC on the Superior Court's business law session committee. Apparently EMC's general counsel, as part of his work on that committee, had spoken to the Chief Justice about the lack of a business litigation session outside of Suffolk County. He preferred the more definite trial dates offered in that session, and as an example told the Chief Justice of his frustration that the present case had lost an earlier trial date in January, 2004. Several weeks after that conversation — sometime in mid-March — the general counsel and the Chief Justice again spoke about committee matters, and she asked him whether the case had come to trial. He told her it had not. That was the extent of their conversation on the matter. There was no suggestion that the general counsel had made any request that the trial date be moved up.

Masingill moved for recusal, reassignment, and an evidentiary hearing on April 5, 2004. The next day, before the jury were empanelled, the judge held a hearing on the motion. Defense counsel took no position on the motion. She did, however, explain the circumstances of the contacts between the Chief Justice and the general counsel, and stated unequivocally "that the defendants did not in any way forum shop, judge shop, or ask for a reassignment of this case."

The judge reported that he learned of the trial's move into his session from the Regional Administrative Judge. He was not personally familiar with any of the parties, and had in the past only had professional contact with the attorneys. There was no suggestion that he had any bias, interest, or predisposition in the case. While expressing an understanding of Masingill's concerns, the judge believed that, given the lack of any suggestion that he was not impartial, they did not warrant recusal or reassignment. The judge concluded that the matter "had to do with administration and management issues that are [in the

---

[29]Until informed by Masingill's counsel, defense counsel was unaware that the case had been moved into the "C" session at the direction of the Chief Justice.

Chief Justice's] province[,] not mine," and he "[took] no position on whether the communications were proper or improper." He also told counsel that "there have been no communications with me from the Chief Justice on this or any other issue relating to this case." Accordingly, the judge denied the motion, and the case went to trial before him. Masingill appeals from the judge's denial of her motion for recusal.

"The matter of recusal is generally left to the discretion of the trial judge, . . . and an abuse of that discretion must be shown to reverse a decision not to allow recusal" (citations omitted). *Haddad* v. *Gonzalez*, 410 Mass. 855, 862 (1991). We have described a judge's decision on a motion for recusal as encompassing two steps:

> "Faced, then, with a question of his capacity to rule fairly, the judge [must] consult first his own emotions and conscience. If he [passes] the internal test of freedom from disabling prejudice, he must next attempt an objective appraisal of whether this was 'a proceeding in which his impartiality might reasonably be questioned.' S.J.C. Rule 3:25 [former Code of Judicial Conduct], Canon 3 (C) (1) (a), 359 Mass. 841 (1972)."[30]

*Lena* v. *Commonwealth*, 369 Mass. 571, 575 (1976).

The judge undertook the inquiry described in *Lena* v. *Commonwealth, supra.* He revealed all of his actual and possible connections with both the parties and their attorneys, and stated that he had no involvement in the movement of the case into his session other than a telephone call from the Regional Administrative Justice informing him of the change. After hearing the concerns of both parties, he concluded both that he felt no prejudice and that there was no reasonable basis to question his impartiality.[31] Accordingly, he declined to recuse himself.

We see no abuse of discretion in the judge's conclusion.

---

[30]This language is the same in the present Code of Judicial Conduct, S.J.C. Rule 3:09, Canon 3 (E) (1), as appearing in 440 Mass. 1319 (2003): "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer . . . ."

[31]Defense counsel also noted that the earlier denial of the defendants' mo-

Nothing in his prior contacts suggested any basis for a suspicion of bias on his part. He was also wholly uninvolved in the events surrounding the transfer.[32] Whatever the circumstances of the transfer, the judge's impartiality was never in question. Counsel for Masingill conceded as much to the judge: "None of [my reasons for seeking recusal], sir, relate[s] to any belief on my part that you have any particular bias or anything."

We understand why Masingill feels that her case may have been treated unfairly. The circumstances surrounding the change of session were unusual, and deserved the consideration the judge gave the issue. On this record, however, the judge's impartiality was abundantly clear. As there remained no appearance of impartiality on his part, the judge had no reason to recuse himself.

6. *Conclusion.* The judge's order denying the plaintiff's motion for a new trial is affirmed. The judge's order denying the defendants' motion for judgment notwithstanding the verdict is reversed. The underlying judgment as to Skates is affirmed. The underlying judgment and award of costs in favor of the plaintiff against Schwartz is reversed. Judgment shall enter for the defendants on all counts, with costs.

*So ordered.*

---

tion for summary judgment suggested that, at least so far as the application of the law to this case was concerned, the judge might more plausibly be seen to favor Masingill. In any case, the defendants took no position on the motion.

[32] Masingill repeatedly describes the conversations between the general counsel of EMC and the Chief Justice of the Superior Court as an improper "ex parte communication." Whatever their propriety, they were not "ex parte communications." An "ex parte communication" is a "communication between counsel and the court when opposing counsel is not present." Black's Law Dictionary 296 (8th ed. 2004). In this situation, none of the contents of the communications was ever relayed to the court, that is, to the trial judge.