# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

<table>
<tr><td>AI LITIGATION FINANCE<br>ASSOCIATES, INC.,</td><td>)<br>)<br>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)<br>)</td><td></td></tr>
<tr><td>v.</td><td>) C.A. No. N25C-03-056 SKR CCLD<br>)<br>)</td><td></td></tr>
<tr><td>FORTUNA-INSIGHTS, INC.,</td><td>)<br>)</td><td></td></tr>
<tr><td>Defendant.</td><td>)</td><td></td></tr>
</table>

Submitted: July 1, 2025
Decided: September 4, 2025

*Upon Defendant's Motion to Dismiss*
**GRANTED**

## MEMORANDUM OPINION AND ORDER

Alexandra M. Cumings, Esq., Jaco M. Perrone, Esq., MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, Delaware. *Attorneys for Plaintiff*.

Thomas E. Hanson, Jr., Esq., BARNES & THORNBURG LLP, Wilmington, Delaware. *Attorneys for Defendant*.

**RENNIE, J.**

# I. INTRODUCTION

This is a breach of contract action between Plaintiff AI Litigation Finance Associates, Inc. ("ALFA"), and Defendant Fortuna-Insights, Inc. ("Fortuna").[1] ALFA alleges that Fortuna breached the parties 2024 license agreement (the "License Agreement") by denying access to Fortuna's proprietary AI-based legal research software (the "Software").[2] ALFA filed its Complaint – asserting five causes of action – to remedy that alleged breach.[3]

---

[1] *See generally* Verified Complaint for Specific Performance (hereafter "Compl.") (D.I. 1). The Complaint's reference to specific performance appears to be an artifact of ALFA originally filing this action in the Delaware Court of Chancery. *See* Verified Complaint for Specific Performance (hereafter "Chancery Compl.") (T.I. 74195592) (filing in the Court of Chancery). Vice-Chancellor Laster dismissed ALFA's Complaint without prejudice for lack of subject-matter jurisdiction – holding that the Court of Chancery lacked jurisdiction to order specific performance of a personal services contract. *See* Order Dismissing Complaint Without Prejudice (hereafter "Dismissal Order") (T.I. 75712434). ALFA then elected to transfer its case to the Complex Commercial Litigation Division of this Court. *See* Order Granting Plaintiff's Election to Transfer ("Transfer Order") (T.I. 75772216). The Superior Court of Delaware "is incapable of ordering specific performance." *FirstString Research, Inc. v. JSS Medical Research Inc.*, 2021 WL 2182829, at *6 (Del. Ch. May 28, 2021); *see Nat'l Indus. Grp. v. Carlyle Inv. Mgmt., LLC*, 67 A.3d 373, 382 (Del. 2013) ("the Court of Chancery is the Delaware court that is constitutionally and statutorily empowered to grant injunctions and to order specific performance."). If the Complaint only states a claim for specific performance, the Court lacks subject matter to resolve ALFA's claims. *See Haney v. Blackhawk Network Holdings, Inc.*, 2017 WL 543347, at *4-5 (Del. Super. Feb. 8, 2017). Fortuna's Motion to Dismiss raises the issue of whether the Complaint sufficiently alleges recoverable damages this Court has the authority to award. *See* Defendant's Opening Brief in Support of its Motion to Dismiss Plaintiff's Complaint (hereafter "MTD") at 18-19. Accordingly, the Court briefly addresses the sufficiency of ALFA's damage pleadings below. *See infra* n.76.

[2] *See* Compl. ¶¶ 1-4; Letter eclosing Plaintiff's sealed Verified Complaint for Specific Performance from the Court of Chancery Action (hereafter "Ltr."), Ex. A, Ex. A (hereafter "License Agreement" (D.I. 8); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) ("[o]n a motion to dismiss, the Court may consider documents that are integral to the complaint[.]" (internal quotes omitted)).

[3] Specifically, the Complaint alleges: (1) Count I – Breach of Contract; (2) Count II – Anticipatory Repudiation; (3) Count III – Breach of the Implied Covenant of Good Faith and Fair Dealing; (4) Count IV – Promissory Estoppel; and (5) Award of Costs and Fees under the License Agreement. *See* Compl. ¶¶ 42-78.

Before the Court is Fortuna's Motion to Dismiss (the "Motion").[4] The Motion seeks dismissal of the entire Complaint, because: (1) the License Agreement is unenforceable; (2) Counts III and IV fail to state a claim; and (3) ALFA does not sufficiently allege recoverable damages.[5] AFLA maintains that the Complaint states well-pled claims for damages based on the enforceable License Agreement.[6] For the reasons discussed below, the Court **GRANTS** Fortuna's Motion.

## II. BACKGROUND

### A. The Parties and the License Agreement

Plaintiff ALFA is a Delaware corporation founded by non-party F. Moore Watkins, Jr. ("Watkins"), who also serves as the company's CEO.[7] Non-party Joseph Sullivan ("Sullivan") worked as a consultant for ALFA until July 2024.[8] Critically, Watkins did not incorporate ALFA until the day after the parties executed the License

---

[4] *See generally* MTD.

[5] *See id.* at 2-3, 10-19. Additionally, Fortuna argues that Count V fails to state a claim for an award of costs and fees under Section 11.2 of the License Agreement. *See id.* at 19 (citing License Agreement § 11.2). As the parties' briefing makes clear, Count V's viability depends on the enforceability of the License Agreement and whether ALFA's other claims are well-pled. *Compare id.* ("the License Agreement is not valid or enforceable . . . [a]ccordingly, ALFA cannot recover indemnification under Count V[.]"), *and* Defendant's Reply in Further Support of its Motion to Dismiss (hereafter "MTD Reply") at 19 (D.I. 7) ("ALFA does not dispute" that Count V fails if its other claims are not meritorious), *with* Plaintiff's Answering Brief in Opposition to Defendant's Motion to Dismiss (hereafter "MTD Opp'n") at 31-32 (D.I. 6) (arguing Count V states a cognizable claim for attorneys' fees, because ALFA's other Counts are well-pled and the License Agreement is enforceable). As such, whether Count V should be dismissed rises and falls with the Court's resolution of Fortuna's other arguments. Thus, the Court does not discuss Count V specifically.

[6] *See* MSJ Opp'n at 1-3, 10-31.

[7] Compl. ¶ 5. Watkins has 30 years of experience in the "finance and software technology" sectors. *Id.* ¶ 10.

[8] *Id.* ¶ 7; *see also* Ltr., Ex. A, Ex. B (hereafter "Consulting Agreement").

Agreement.[9] Hence, ALFA "is a new company just getting its business off the ground."[10] Access to the Software is critical to ALFA's viability.[11]

Defendant Fortuna is a Delaware Corporation founded by non-parties Kimo Gandall ("Gandall"), Kenneth McLaren, and Jameson Axton.[12] Fortuna's main product is the Software.[13]

The parties' relationship began when Sullivan introduced Watkins to Gandall at MITs start-up incubator.[14] Watkins provided certain "early-stage financial work to Fortuna," and the parties began discussing a long-term relationship.[15]

In May 2024, ALFA and Fortuna executed the License Agreement.[16] Watkins signed the License Agreement on ALFA's behalf.[17] In the License Agreement, both parties represented and warranted:

> (i)[t]hat it is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation; [and] (ii) that it has the legal

---

[9] *See* Ltr., Ex. A, Ex. D (hereafter "Termination Response") (admitting ALFA did not exist when the parties signed the License Agreement, but insisting the License Agreement is nevertheless valid as a "preincorporation agreement[.]" (citing *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 745 (Del. 2006))); MSJ Opp'n at 2-3 ("the one-day lag in incorporation . . ."), 7-8 ("Fortuna could not possibly have cared about ALFA's incorporation status for the single day of May 23, 2024[.]"), 21-23 ("ALFA cured any purported breach the day it incorporated, i.e., the day after the execution of the License Agreement.").

[10] Compl. ¶ 41 ("ALFA has sourced engagements with multiple potential clients, and imminently expects to kick off work for clients[.]").

[11] *Id.* ("[w]ithout access to the Software, ALFA is completely foreclosed from performing services to its actual and prospective clients.").

[12] *Id.* ¶¶ 6, 10.

[13] *Id.* ¶ 6.

[14] *Id.* ¶ 11.

[15] *Id.* ¶¶ 12-13.

[16] *Id.* ¶ 14; *see* License Agreement.

[17] License Agreement at Signature Page.

right and authority to enter into and perform its obligations under this Agreement[.][18]

The License Agreement grants ALFA "an exclusive . . . irrevocable, worldwide, fully-paid right and license to use and access the [] Software."[19] Fortuna also agreed to provide support services to ALFA during the License Agreement's term.[20]

The License Agreement's term runs in perpetuity, unless terminated pursuant to Section 8.2.[21] Under Section 8.2:

> [e]ither Party may terminate [] [] effective on written notice to the other Party, if the other Party materially breaches th[e] Agreement, and such breach: (A) is incapable of cure; or (B) being capable of cure, remains uncured sixty (60) days after the non-breaching Party provides the breaching Party with written notice of such breach.[22]

Section 8.3 contemplates that certain "rights and obligations" "fundamental" to the License Agreement's "purpose" may survive termination.[23]

## B. Fortuna Terminates the License Agreement

After ALFA entered into the License Agreement, Watkins and Sullivan's relationship began to breakdown.[24] On July 18, 2024, Watkins informed Gandall of

---

[18] License Agreement § 9.1.
[19] *Id.* § 2.1. The specifics of how the parties planned to interact under the License Agreement are not relevant to resolving the Motion. Generally, ALFA would submit data and queries to Fortuna, which would use the Software to generate predictive analysis which ALFA would provide to its clients. *See* License Agreement §§ 1.1; 5.1; Schedule A.
[20] *Id.* § 4; Schedule C.
[21] *Id.* § 8.1.
[22] *Id.* § 8.2.
[23] *Id.* § 8.3.
[24] Compl. ¶¶ 24-29.

the circumstances surrounding Sullivan's potential departure from ALFA.[25] A week later, Sullivan terminated his Consulting Agreement and left ALFA.[26] The same day, Gandall called Watkins and asked him to abandon the License Agreement, because Sullivan's presence was central to Fortuna's desire to work with ALFA.[27] Watkins refused.[28] The next day, Fortuna sent a letter to ALFA purporting to terminate the License Agreement (the "Termination Letter").[29]

Fortuna claimed a right to terminate because "[i]t has come to Fortuna's attention that ALFA was not [] duly organized, validly existing, and in good standing under the laws of the State of Delaware until May 24, 2024" – the day after it executed the License Agreement.[30] Therefore, the Termination Letter claimed "ALFA [] lacked the ability to enter into the License Agreement on May 23."[31] ALFA responded "explaining that the mere day-long gap between when ALFA was formed and when it signed the License Agreement was immaterial and did not affect the validity of the Agreement" (the "Termination Response").[32] As such, the

---

[25] *Id.* ¶ 30. ALFA alleges "Gandall accepted the possibility of Sullivan's departure and was enthusiastic about ALFA. Gandall began making plans to grow the relationship, such as committing to traveling with Watkins to pitch ALFA to investors." *Id.*

[26] *Id.* ¶ 32.

[27] *Id.* ¶ 33.

[28] *Id.*

[29] *Id.* ¶ 34; *see* Ltr., Ex. A, Ex. C (hereafter "Termination Letter").

[30] Termination Letter (arguing that breach of Section 9.1 of the License Agreement "is incapable of cure.").

[31] Compl. ¶ 34.

[32] *Id.* ¶ 35; *see* Termination Response.

Termination Response denied the Termination Letter's effectiveness.[33] Nevertheless, Fortuna cut off ALFA's access to the Software, prompting Plaintiff to file this suit.[34]

### C. Procedural History

ALFA first filed suit in the Delaware Court of Chancery in August 2024.[35] After the Court of Chancery dismissed the Complaint for lack of subject matter jurisdiction,[36] ALFA transferred the case to this Court in March 2025.[37]

In April 2025, Fortuna filed the Motion to Dismiss before the Court.[38] The parties timely completed briefing on the Motion in the following weeks.[39] The Court heard oral argument regarding the Motion on July 1, 2025.

## III.   STANDARD OF REVIEW

Under the well-settled Rule 12(b)(6) motion to dismiss standard:

(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'[40]

---

[33] *See* Termination Response.
[34] Compl. ¶ 36.
[35] *See generally* Chancery Compl.
[36] *See generally* Dismissal Order.
[37] *See generally* Transfer Order; Compl.
[38] *See generally* MTD.
[39] *See generally* MTD Opp'n; MTD Reply.
[40] *In re General Motors (Hughes) Shareholder Litigation*, 897 A.2d 162, 168 (Del. 2006) (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

The Court does not, however, "credit conclusory allegations that are unsupported by specific facts or draw unreasonable inferences in the plaintiff's favor."[41]

## IV.  DISCUSSION

The Motion advances four main arguments. First, the Motion asks the Court to dismiss Counts I through III, because the License Agreement is invalid.[42] Second, the Motion contends that Count III fails to state a valid implied covenant claim.[43] Third, Fortuna similarly asserts that Count IV does not allege a well-pled promissory estoppel claim.[44] Finally, Fortuna argues that Counts I through IV should be dismissed for failure to allege recoverable damages.[45] The Court evaluates each argument in turn.

### A. Counts I, II, III, and V Fail, because the License Agreement is Not a Valid Enforceable Contract.

Fortuna argues that ALFA's contract-based claims should be dismissed for two independent reasons.[46] First, Fortuna asserts that the License Agreement is not a valid contract, because ALFA did not exist when it purported to execute the

---

[41] *Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 100 (Del. 2013).
[42] *See* MTD at 10-14.
[43] *See id.* at 15-16.
[44] *See id.* at 17-18.
[45] *See id.* at 18-19.
[46] *See id.* at 10-14 (citing *Boulden v. Albiorix, Inc.*, 2013 WL 396254, at *10-11 (Del. Ch. Feb. 7, 2013) (noting a valid contract is a necessary element of a breach of contract claim); *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *15 (Del. Ch. Sept. 18, 2014) (holding an anticipatory repudiation claim requires a valid contract); *Glaxo Group Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021) (stating an implied covenant claim arises from a valid contract)).

agreement.[47] Second, Fortuna argues that ALFA's non-incorporated status materially[48] and incurably[49] breached Section 9.1.[50] Fortuna insists that the breach justified the Termination Letter's cancellation of the License Agreement.[51] Because the Court agrees that the License Agreement is not a binding contract, it need not consider the materiality of ALFA's alleged breach.

ALFA maintains that the License Agreement is an enforceable contract.[52] ALFA acknowledges that it did not exist when Watkins signed the License Agreement but insists that "the doctrines of promoter liability and preincorporation agreements" make the contract valid.[53] ALFA argues that the Complaint alleges: (1) the parties intended to be bound by the License Agreement; (2) Fortuna knew

---

[47] *Id.* at 10-11.
[48] *Id.* at 12 (citing *Reserves Development LLC v. R.T. Properties, LLC*, 2011 WL 4639817, at *4 (Del. Super. Sept. 22, 2011) ("[a] warranty . . . is always presumed to be material[.]").
[49] *Id.* at 13 ("it is impossible for ALFA to go back in time to incorporate before Watkins executed the License Agreement[.]").
[50] MTD at 11-13 (citing License Agreement § 9.1).
[51] *Id.* at 13-14 (citing License Agreement § 8.2).
[52] MTD Opp'n at 12-16 (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) (holding a valid contract exists when: "(1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration.")).
[53] *Id.* (citing *Tygon Peak Cap. Mgmt., LLC v. Mobile Invs. Investco, LLC*, 2022 WL 34688, at *13 n.134 (Del. Ch. Jan. 4, 2022)). According to ALFA, under those doctrines "a contract will be binding on a subsequently formed corporation where, as here, the corporation expressly or 'implicitly adopts the pre-formation agreement by accepting its benefits with knowledge of its terms.'" *Id.* at 13 (quoting *Grunstein v. Silva*, 2009 WL 4698541, at *18 (Del. Ch. Dec. 8, 2009)). ALFA rejects Fortuna's position that the preincorporation agreement doctrine only applies to suits seeking to bind the later-formed corporate, as contrary to "Delaware law, logic, and notions of fairness." *Id.* at 16 (citing MTD at 12-13).

Watkins was acting as a promoter; and (3) "ALFA adopted the License Agreement" post-incorporation.[54]

Fortuna criticizes ALFA for misstating the promoter liability doctrine's scope.[55] According to Fortuna, the promoter liability "exception applies where a company attempts to avoid liability under a contract by arguing it had not been formed at the time its promoter signed the agreement."[56] In this case, however, "the unincorporated entity (ALFA) is not trying to avoid liability . . . [it] is the party seeking to enforce the contract against an unsuspecting counterparty (Fortuna)."[57] Fortuna also argues that the License Agreement's non-assignment and no third party beneficiary clauses bar application of the preincorporation agreement doctrine.[58]

It is axiomatic that contract-based claims – like Counts I, II, and III – require the existence of a valid contract.[59] It is a similarly longstanding principle that a contract requires two parties.[60] A corporation "does not come into existence until the

---

[54] *Id.* at 15-16 (citing Compl. ¶¶ 12-13, 24-25).
[55] MTD Reply at 5-7.
[56] *Id.* at 5.
[57] *Id.* Fortuna also argues the policy rational underlying the promoter liability doctrine "fails where a party seeks to benefit despite its failure to follow corporate formalities." *Id.* at 6-7 (citing *Grunstein*, 2009 WL 4698541, at *18).
[58] *Id.* at 7-8 (citing License Agreement §§ 12.7(a), 12.8). Specifically, Fortuna contends that those provisions show "adoption [by a non-signatory] is neither contemplated nor allowed under the express provisions of the License Agreement." *Id.* at 8; *see American Legacy Foundation v. Lorillard Tobacco, Co.*, 831 A.2d 335, 344 (Del. Ch. 2003) (holding that for the preincorporation doctrine to apply "[t]he contract itself . . . must contemplate that non-signatories may adopt it.").
[59] *See, e.g.*, *Central Mortg. Co. v. Morgan Staney Mortg. Capital Holdings LLC*, 27 A.3d 531, 535-36 (Del. 2011).
[60] *Stockwell v. Robinson*, 32 A. 528, 530 (Del. Super. 1892).

Certificate of Incorporation is [] filed with the Secretary of state."[61] Therefore, corporations are generally not subject to agreements made prior to their incorporation date.[62] ALFA does not seriously dispute these black letter principles – instead arguing that the License Agreement is valid under the "preincorporation agreement[]" doctrine.[63]

Under the preincorporation agreement doctrine " if the subsequently formed corporation expressly adopts the preincorporation agreement or implicitly adopts it by accepting its benefits with knowledge of its terms, *the corporation is bound by it*."[64] Delaware courts have *only* invoked the doctrine in cases where the later-formed corporation argued it was not bound by the preincorporation contract.[65] This case presents the opposite scenario – the later-formed corporation seeks to hold its counterparty liable under the preincorporation agreement. ALFA points to no case where any court has applied the preincorporation doctrine in such a way. The Court agrees with Fortuna – the public policy rationale underlying the preincorporation

---

[61] *Cleary v. North Delaware A-OK Campground, Inc.*, 1987 WL 28317, at *4 (Del. Super. Dec. 9, 1987).

[62] *See Grunstein*, 2009 WL 4698541, at *18.

[63] *See Lorillard Tobacco*, 903 A.2d at 744 ("the doctrine of preincorporation agreements allows a promoter who is establishing a corporation to enter into agreements that bind the nascent corporation." (citations omitted)).

[64] *see Lorillard Tobacco*, 903 A.2d at 745 (emphasis added).

[65] *See id.* ("ALFA [the nascent corporation] is required to perform its obligations and can be held liable if found to have breached the MSA."); *Grunstein*, 2009 WL 4698541, at *18 ("if the subsequently formed entity implicitly adopts the pre-formation agreement by accepting its benefits with knowledge of its terms, *the entity may be bound by that agreement*." (emphasis added)); *accord Tygon Peak*, 2022 WL 34688, at *13 n.134.

11

doctrine does not apply when the later-formed corporation is the party invoking the agreement.[66] Moreover, the License Agreement seemingly does not contemplate ALFA's adoption.[67] Thus, the preincorporation doctrine does not apply to the factual situation alleged in the Complaint. As such, ALFA has not overcome the general rule that an agreement is void where one party did not exist at the time of contracting. Accordingly, the Court **GRANTS** the Motion and Dismisses Counts I, II, III, and V.[68] Because the Court concludes the License Agreement is invalid, it need not address the materiality of ALFA's alleged breach.[69]

---

[66] The doctrine exists to allow nascent entities to procure "the rights, instrumentalities and capital by which it is to carry out the purposes set forth in its charter, and to establish it as fully able to do its business." *Tygon Peak*, 2022 WL 34688, at *13 n.134 (internal quotes omitted). Under this policy, the preincorporation agreement doctrine makes sense. Often a corporation's viability depends on securing certain rights, products, land, etc. As such, would-be-incorporators may not form entities if they cannot secure those essential rights from the outset. Yet, providers of those services may hesitate to contract with nascent corporations or their promoters, if the agreement can be disclaimed on the basis that the corporation was not yet incorporated. The preincorporation agreements and promoter liability doctrines obviate this concern. Because a corporation and its promoter exclusively control the incorporation date, the same risks are not present when the nascent corporation itself seeks to enforce the agreement.

[67] *See* License Agreement § 12(a) ("[e]xcept as expressly permitted by the terms and provisions herein, neither Party shall assign any of its rights or delegate any of its duties hereunder without the prior written consent of the other Party[.]"); *Lorillard Tobacco*, 903 A.2d at 745 (holding the preincorporation agreement doctrine applied because "the [contract] should be viewed, as a matter of law, as expressly contemplating [the nascent corporation's] adoption." (internal quotes omitted)).

[68] Count V alleges ALFA is entitled to its costs and fees in this litigation pursuant to Section 11.2 of the License Agreement. Compl. ¶¶ 75-78. A party is not entitled to attorneys' fees "absent a statutory or contractual provision." *Dover Historical Soc., v. City of Dover Planning Com'n*, 902 A.2d 1084, 1091 (Del. 2006). Therefore, holding that the License Agreement is unenforceable, invalidates AFLA's attorneys' fee claim.

[69] Even if the Court were to consider the issue, it could not resolve the materiality of ALFA's alleged breach as a matter of law. *See IP Network Solutions, Inc. v. Nutanix, Inc.*, 2022 WL 369951, at *11 (Del. Super. Feb. 8, 2022) ("Delaware Courts routinely recognize that materiality is a question of fact that is ordinarily not suited for judgment as a matter of law."). Fortuna argues that ALFA breached a contractual "warranty," and relies on *Reserves Development* to argue that such

## B. Count IV is Dismissed Without Prejudice.

Fortuna argues that Count IV must be dismissed for failure to identify a promise independent of the License Agreement.[70] The only promise alleged in Count IV is explicitly based on Section 2.1 of the License Agreement.[71] An equitable estoppel claim must be dismissed "[w]here the representation or promise at issue is

---

a breach is always material. MTD Reply at 9-10 (citing *Reserves Development*, 2011 WL 4639817, at *4). *Reserves Development* held "[a] warranty, unlike a representation, is always presumed to be material in order to recover damages." *Reserves Development*, 2011 WL 4639817 at *4 (citing *Masingill v. EMC Corp.,* 870 N.E.2d 81 (Mass. 2007)). The court cited a single Massachusetts case to support that assertion. *Id.* That proposition has not gained wide acceptance in Delaware. The Court is not aware of a single case that cites *Reserves Development* for the notion that breaching a contractual warranty is material as a matter of law. Indeed, the *Reserves Development* holding regarding materiality is inconsistent with numerous subsequent cases, which held breaching a warranty was not material or a question of fact. *See, e.g.*, *Matthew v. Laudamiel*, 2014 WL 5499989, at *1-2 (Del. Ch. Oct. 30, 2014); *2009 Caiola Family Trust v. PWA, LLC*, 2015 WL 6007596, at *27 (Del. Ch. Oct. 14, 2015). Therefore, the Court is not convinced by *Reserves Development*'s isolated statement regarding whether a breach of a contractual warranty is always material. Rather, if the Court reached the materiality issue it would apply binding caselaw that provides "[d]etermining whether a [provision] is a material part of an agreed exchange" is generally a factual inquiry. *Thompson Street Capital Partners IV, L.P. v. Sonova United States Hearing Instruments, LLC*, 2025 WL 1213667, at *11 (Del. 2025).

[70] MTD at 17-18 (citing *SIGA Technologies, Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 348 (Del. 2013)). ALFA rejects this argument, maintaining that Count IV states a well-pled "promissory estoppel claim in the alternative to its contract-based claims because Fortuna is challenging the validity and enforceability of the License Agreement." *Id.* at 31. Fortuna rebukes the pleading in the alternative argument as unsupported by caselaw. MTD Reply at 15. The briefing makes clear that Fortuna's sole argument with respect to Count IV is that "the promissory estoppel claim is entirely duplicative of ALFA's breach of contract claim." MTD Reply at 15-16.

[71] Compl. ¶ 68 (quoting License Agreement § 2.1).

documented in a contract[.]"[72] Thus, Count IV must be dismissed.[73] Hence, the Court

**GRANTS** the Motion and dismisses Count IV without prejudice.[74]

---

[72] *Hallisey v. Artic Intermediate, LLC*, 2020 WL 6438990, at *4 (Del. Ch. Oct. 29, 2020).

[73] As discussed above, the License Agreement is not a valid contract. *See supra* IV.A.1. As such, while "a promise expressed in a *fully enforceable* contract cannot give rise to a promissory estoppel claim," there is no enforceable agreement which prohibits ALFA from pursuing its promissory estoppel claim. *SIGA*, 67 A.3d at 334 (emphasis added); *see Owens v. Carman Ford, Inc.*, 2013 WL 5496821, at *4 (Del. Super. Sept. 20, 2013) (holding promissory estoppel allows a party to enforce promises made outside the context of an enforceable agreement."); *see also James v. United Medical LLC*, 2017 WL 1224513, at *7-8 (Del. Super. Mar. 31, 2017) (holding "[a] party [] may plead promissory estoppel in the alternative to a contract claim" when the parties "dispute whether the [relevant agreement] is an enforceable contract."). Accordingly, the Court dismisses Count IV *without prejudice*, giving ALFA the option to refile.

[74] Because ALFA's Complaint fails to state any claim, the Court need not address the parties' arguments concerning damages. Yet, the Court is cognizant that its dismissal of Count IV without prejudice could result in ALFA refiling a new promissory estoppel claim. Accordingly, the Court briefly discusses the parties' damages positions. The Complaint broadly seeks two remedies: (1) specific performance of Fortuna's promises in the License Agreement;  and (2) "[d]amages in an amount to be determined at trial. *See* Compl. ¶¶ 4, 48, 51-52, 60, 66, 77, Prayer for Relief. The Court lacks authority to order specific performance. *See supra* n.1. Additionally, as a nascent business ALFA cannot recover lost profits. *See Metro Storage International LLC v. Harron*, 275 A.3d 810, 860 (Del. Ch. May 4, 2022) (collecting case) ("Delaware courts regularly refuse to award damages based on the lost profits . . . deeming evidence of lost profits to be too speculative, uncertain, and remote when there is no history of prior profits."). There is no dispute that ALFA is a new business with no history of profits. *See, e.g.*, Compl. ¶ 41 ("ALFA is a new company just getting its business off the ground. ALFA has sourced engagements with multiple *potential* clients, and immediately *expects* to kick off work for clients . . . [w]ithout access to the Software, ALFA is completely foreclosed from performance services[.]" (emphasis added)). Accordingly, ALFA cannot recover any lost profit damages, which are inherently speculative.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Fortuna's Motion. Counts I, II, III, and V, are dismissed with prejudice, while Count IV is dismissed without prejudice.

**IT IS SO ORDERED.**

_____
Sheldon K. Rennie, Judge