# United States Court of Appeals
## For the First Circuit

No. 13-1214

HSBC REALTY CREDIT CORPORATION (USA),

Plaintiff, Appellee,

v.

J. BRIAN O'NEILL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Torruella, Ripple,[*] and Thompson,
Circuit Judges.

John J. Jacko III, with whom Alan S. Fellheimer and Fellheimer
& Eichen LLP were on brief, for appellant.
David J. McNamara, with whom Peter C. Obersheimer and Phillips
Lytle LLP were on brief, for appellee.

February 7, 2014

[*] Of the Seventh Circuit, sitting by designation.

**THOMPSON, <u>Circuit Judge</u>.**

**OVERVIEW**

Today's case — a diversity suit governed, the parties agree, by Massachusetts substantive law — arises from the efforts of plaintiff HSBC Realty Credit Corporation (USA) to recover $8.1 million from defendant J. Brian O'Neill under a guaranty. A district judge struck O'Neill's defenses, dismissed his counterclaims, denied him leave to replead, and granted HSBC judgment on the pleadings. O'Neill appeals. But after saying what needs to be said, we affirm.

**HOW THE CASE GOT HERE**

Given the litigation's present posture, we describe the facts alleged in the pleadings — discussing too the documents fairly incorporated within them — in the light most agreeable to O'Neill, drawing every reasonable inference in his favor. <u>See</u>, <u>e.g.</u>, <u>Grajales</u> v. <u>P.R. Ports Auth.</u>, 682 F.3d 40, 44 (1st Cir. 2012).

**The Players and the Project**

HSBC is a Delaware corporation with its principal place of business in New York. O'Neill is a Pennsylvania resident who is a principal of a company called Brandywine Partners, LLC.[1] Back in

---

[1] A quick "fyi": Citizenship is what matters for diversity-jurisdiction purposes, <u>see</u> 28 U.S.C. § 1332(a)(1) — and a corporation is a citizen of both the state where it is incorporated and the state where it has its principal place of business, <u>id.</u> § 1332(c)(1), while a person is a citizen of the state where he is

the mid-2000s, Brandywine wanted to buy a particular piece of industrial property in Delaware and redevelop it for residential use. Because of some fairly serious environmental problems with the Delaware site, Brandywine concluded — after an extensive investigation — that the best course of action was to raze the existing buildings and start from scratch. Eventually Brandywine turned to HSBC for a loan. And HSBC agreed to dole out $15.9 million pursuant to a project-loan agreement between them.

### The Project-Loan Agreement

Among other things, the project-loan agreement requires Brandywine to pay for an appraisal of the property. And the agreement says that this appraisal has to yield a loan-to-value ratio of no more than 60%. That condition, the document continues, is for HSBC's "sole benefit," meaning "no other person" has "the right to rely on" its "satisfaction."[2] Using that ratio, the

domiciled, which (at the risk of oversimplification) is the place where he intends to remain, see Rodríguez v. Señor Frog's de la Isla, Inc., 642 F.3d 28, 32 (1st Cir. 2011).

[2] As a heads-up, whenever we quote a document in the text, we do away with unnecessary capitalization or bolding of words. But to give the reader a better sense of the documents' setup, we present some of the relevant provisions (like these ones) in footnotes, reproducing them essentially as they appear in the papers:

property's appraised value had to be at least $26.5 million to support the $15.9 million loan — or so O'Neill alleges.[3]  Also relevant, Brandywine expressly "acknowledges" in the project-loan agreement that HSBC was "rel[ying] on the experience of [Brandywine] and its general partners, members, [and] principals . . . in owning and operating" properties like this and that HSBC "ha[s] a valid interest in maintaining" the property's "value . . . to ensure that, should [Brandywine] default in the repayment and

**II.  THE LOAN**

. . .

**Section 2.9 Conditions Precedent to Disbursement of Project Loan Proceeds.**

**2.9.1 <u>Conditions of Advances</u>**. . . .

. . .

(p) <u>Appraisal</u>.  [HSBC] shall have received [an] . . . appraisal of the Property, commissioned by [HSBC] at [Brandywine's] cost and expense, that indicates an "as is" Loan-to-Value Ratio which does not exceed 60% and that is otherwise satisfactory to [HSBC] in its sole discretion.

. . .

**2.9.3 <u>No Reliance</u>.**  All conditions and requirements of this Agreement are for the sole benefit of [HSBC] and no other Person . . . shall have the right to rely on the satisfaction of such conditions and requirements by [Brandywine].

[3] The loan documents say nothing about the property's value. But O'Neill theorizes that HSBC must have pegged the property's value at $26.5 million, because the project-loan agreement provides that the $15.9 million loan amount cannot exceed 60% of the property's value.

-4-

performance of the obligations under the project loan documents, [HSBC] can recover the obligations" by selling the property.[4] Of note too, Brandywine signed a promissory note and gave HSBC a mortgage on the Delaware property (among other things).

## The Guaranty

Because, as he acknowledged, HSBC would not lend Brandywine a cent unless he "unconditionally" guaranteed the loan's repayment, O'Neill signed an "absolut[e]" personal guaranty for the loan, agreeing that he had a "direct or indirect interest" in Brandywine (and so would "directly benefit" from the loan) and that he occupied the status of "primary obligor" of the "guaranteed obligations" (defined as the "prompt and unconditional payment by

---

[4] That piece of the project-loan agreement is set out this way:

**VI.  TRANSFERS**

**Section 6.1  Agent's and Lenders' Reliance.**

[Brandywine] acknowledges that [HSBC] ha[s] examined and relied on the experience of [Brandywine] and its general partners, members, [and] principals . . . in owning and operating properties such as the Property in agreeing to enter into this Agreement and make the Project Loan, and will continue to rely on [Brandywine's] ownership of the Property as a means of maintaining the value of the Property as security for repayment and performance of the Obligations under the Project Loan Documents.  [Brandywine] acknowledges that [HSBC] ha[s] a valid interest in maintaining the value of the Property so as to ensure that, should [Brandywine] default in the repayment and performance of the Obligations under the Project Loan Documents, [HSBC] can recover the Obligations by a sale of the Property.

[Brandywine] of the loan and interest thereon").[5] The guaranty's limitations-on-guaranteed-obligations clause caps O'Neill's liability at $8.1 million, however.[6]

---

[5] This part of the guaranty is laid out like so:

**GUARANTY OF PAYMENT**

. . .

. . . [HSBC] is not willing to make the Loan, or otherwise extend credit, to [Brandywine] unless [O'Neill] unconditionally guarantees payment and performance to [HSBC] of the Guaranteed Obligations (as herein defined)[.]

. . .

**ARTICLE I**

**NATURE AND SCOPE OF GUARANTY**

**1.1  Guaranty of Obligation.**  Subject to the limitations contained in Section 6.15, [O'Neill] hereby irrevocably, absolutely and unconditionally guarantees to [HSBC] . . . the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise.  [O'Neill] hereby irrevocably and unconditionally covenants and agrees that [he] is liable for the Guaranteed Obligations as a primary obligor.

[6] That section reads:

**ARTICLE VI**

**MISCELLANEOUS**

. . .

**6.15    Limitations on Guaranteed Obligations.** Notwithstanding anything in this Guaranty or any of the Loan Documents to the contrary, the liability of [O'Neill] under this Guaranty shall be limited to (a) the Guaranteed Amount (as hereinafter defined) and (b)

-6-

Pertinently too, the guaranty lists a bunch of representations and warranties that O'Neill made to HSBC. For example, he affirmed both that he was "familiar with, and ha[d] independently reviewed books and records regarding," Brandywine's "financial condition" and also that he was "familiar with the value" of the property offered as collateral. He confirmed that neither Brandywine's condition nor the pledge of collateral induced him to sign the guaranty. And he declared that HSBC said nothing to induce him to execute that document, either.[7]

---

amounts due under <u>Section 1.8</u> of this Guaranty. As used herein, the "**Guaranteed Amount**" shall mean an amount equal to $8,100,000.

Section 1.8, which makes O'Neill liable for payment of expenses that HSBC incurs in seeking to enforce the guaranty, provides in full:

> **1.8 <u>Payment of Expenses</u>.** In the event that [O'Neill] should breach or fail to timely perform any provisions of this Guaranty, [O'Neill] shall, within five (5) business days after receipt of written demand from [HSBC], pay [HSBC] all actual and reasonable costs and expenses (including court costs and attorneys' fees) incurred by [HSBC] in the enforcement hereof or the preservation of [HSBC's] rights hereunder. The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations.

[7] Here is how these provisions show up in the guaranty:

<u>ARTICLE III</u>

<u>REPRESENTATIONS AND WARRANTIES</u>

. . .

**3.2 <u>Familiarity and Reliance</u>.** [O'Neill] is familiar with, and has independently reviewed books and

-7-

The guaranty also has a "no duty to pursue others" clause, which stresses that HSBC need not enforce its rights or exhaust its remedies against Brandywine or the property and that O'Neill gives up whatever rights he "may have" to force HSBC to do either of these things.[8] But there is more. O'Neill's guaranty declares that he "waives any common law, equitable, statutory or other rights" that he may have because of "[a]ny action . . .

---

records regarding, the financial condition of [Brandywine] and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, [O'Neill] is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

**3.3 <u>No Representation by Lender</u>**. Neither [HSBC] nor any other party has made any representation, warranty or statement to [O'Neill] in order to induce [O'Neill] to execute this Guaranty.

[8] Also appearing in Article I of the guaranty, which, again, is titled "Nature and Scope of Guaranty," this passage reads in relevant part:

**1.6 <u>No Duty to Pursue Others</u>.** It shall not be necessary for [HSBC] (and [O'Neill] hereby waives any rights which [he] may have to require [HSBC]), in order to enforce the obligations of [O'Neill] hereunder, first to (i) institute suit or exhaust its remedies against [Brandywine] or others liable on the Loan or the Guaranteed Obligations or any other person, (ii) enforce [HSBC's] rights against any collateral which shall ever have been given to secure the Loan, . . . (v) exhaust any remedies available to [HSBC] against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. [HSBC] shall [not] be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

taken" regarding the loan or the collateral that "increases the likelihood that [he] will be required to pay the guaranteed obligations."[9] Topping things off, the guaranty has an integration clause saying that this document is the "final and complete" expression of its terms, that there are "no oral agreements"

---

[9] Here are those provisions:

### ARTICLE II

### EVENTS AND CIRCUMSTANCES NOT REDUCING OR DISCHARGING [O'NEILL'S] OBLIGATIONS

[O'Neill] hereby consents and agrees to each of the following and agrees that [his] obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights . . . which [he] might otherwise have as a result of or in connection with any of the following:

. . .

**2.13  Other Actions Taken or Omitted.**  Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices [O'Neill] or increases the likelihood that [he] will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of [O'Neill] that [he] shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

between the parties, and that no one can use extrinsic evidence of any kind to "contradict" or "modify" any term.[10]

### The Default and the Lawsuit

Brandywine defaulted on its repayment obligations, so HSBC demanded that O'Neill make good on his $8.1 million guaranty. But he turned a deaf ear, causing HSBC to file suit on the guaranty agreement. O'Neill returned fire with 18 defenses and 8 counterclaims. Some of his defenses defy simple labels. Others do not, like his defenses of mitigation, promissory estoppel, breach

---

[10] That provision declares:

### ARTICLE VI

### MISCELLANEOUS

. . .

**6.11 Entirety. THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF [O'NEILL AND HSBC] WITH RESPECT TO [O'NEILL'S] GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY [O'NEILL AND HSBC] AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN [O'NEILL AND HSBC], NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN [O'NEILL AND HSBC].**

The bolding and capitalization here are not mistakes on our part — the provision actually looks this way, which we guess was done so even a lackadaisical reader could not miss it.

of fiduciary duty, breach of an implied covenant of good-faith dealing, fraudulent inducement, duress and undue influence, unconscionable contract of adhesion, no meeting of the minds, and failure to state a claim for which relief may be granted.  As for his counterclaims, they were for fraudulent inducement, promissory estoppel, negligent misrepresentation, unfair and deceptive business practices under Mass. Gen. Laws Ch. 93A, breach of an implied covenant of good-faith dealing, breach of duty to mitigate damages, declaratory and injunctive relief, and breach of contract.

Convinced that there were no material facts in dispute and that judgment should enter enforcing the guaranty's express terms, HSBC moved the judge to strike O'Neill's defenses and to grant it judgment on the pleadings under Fed. R. Civ. P. 12(c). O'Neill resisted by saying that his defenses and counterclaims barred the guaranty's enforcement.[11]  In the alternative, he asked the judge for leave to replead his defenses and counterclaims under Fed. R. Civ. P. 15(a).[12]

Taking up HSBC's motion, the judge said that a common theme pervaded O'Neill's defenses and counterclaims:  "that HSBC must seek to recover any amount owed by Brandywine by proceeding against the [Delaware] property before turning to O'Neill's

---

[11] The parties had attached the key documents to their respective pleadings.

[12] O'Neill did not submit proposed amended pleadings with this request.

personal [g]uaranty," since "HSBC allegedly represented to him that it would in the first instance seek recourse against the collateral property in the event of a default."  And when all was said and done, the judge concluded that the guaranty's unambiguous language wiped out that theory.  So the judge rejected O'Neill's defenses and counterclaims and granted HSBC judgment on the pleadings too.  Concluding that any attempt to amend would be an exercise in futility, the judge also denied O'Neill's plea to replead.

Which gets us to the here and now.

**OUR VIEW OF THE MATTER**

O'Neill hurls a barrage of arguments our way, challenging the grant of judgment on the pleadings and the denial of his request to replead.  We review a Rule 12(c) dismissal like we would a Rule 12(b)(6) dismissal:  <u>de novo</u>, taking as true the losing party's well-pleaded facts and seeing if they add up to a plausible claim for relief.  <u>See</u>, <u>e.g.</u>, <u>Grajales</u>  682 F.3d at 44.  And as a general rule, we review a decision regarding amendments of pleadings for abuse of discretion, though when — as is the case here — futility is the linchpin for the judge's ruling and the leave-to-replead request came before the closing of discovery and the filing of any summary-judgment motion, the correctness of the "futility" tag is tested under the Rule 12(b)(6) standard.  <u>See</u>, <u>e.g.</u>, <u>Hatch</u> v. <u>Dep't for Children, Youth & Their Families</u>, 274 F.3d

-12-

12, 19 (1st Cir. 2001).  Ultimately, however, none of O'Neill's arguments persuades.

## Judgment on the Pleadings

(a)
Fraudulent Inducement

O'Neill loudly protests that his fraudulent-inducement claim should have been enough to defeat HSBC's dismissal efforts. His theory rises or falls on his belief that two provisions in the project-loan agreement constitute false statements of material fact made to induce him to sign the guaranty and that he reasonably relied on those false statements to his detriment.  See, e.g., Hogan v. Riemer, 619 N.E.2d 984, 988 (Mass. App. Ct. 1993) (laying out the elements of a fraudulent-inducement claim).  His theory falls, as we now explain.

The first provision he points to involves the 60% loan-to-value ratio, which he alleges put the collateral property's value at $26.5 million and is an HSBC representation that the chance of its having to call the $8.1 million guaranty was basically zero.  HSBC made that representation, he adds, even though HSBC — and not he — knew that this was not the property's real value.  He does not say what the property's actual value was, but he intimates that it had to have been less when he signed the guaranty and that HSBC had to have known it was less.  This theory, however, flies in the face of the guaranty — the very document where (the reader will recall) he expressly confirmed that he was

-13-

familiar with the property's value, that he was <u>not</u> relying on the property as an inducement to sign the guaranty, and that HSBC made <u>no</u> representations to induce him to execute that document.

The second project-loan-agreement provision he harps on provides (emphasis ours) that if Brandywine defaults, HSBC "<u>can</u> recover the obligations" by selling the property. He reads this contract language as an HSBC representation that it would move against the property before turning to his guaranty — a representation (he continues) made even though HSBC intended all along to collect only against the guaranty. We are unmoved. Merely to state the obvious, that proviso says that HSBC "<u>can</u>" proceed first against the property, not that it <u>must</u> do so. Anyway, what drives a stake through the heart of this part of his inducement theory is his agreeing in the guaranty that HSBC said nothing to induce him to make the guaranty. And do not forget that his guaranty specifically proclaims that it is the "entire agreement" between the parties, superseding all prior "understandings," and explicitly provides that HSBC may enforce its rights against him (the primary obligor) without first trying to recover the debt from any pledged collateral.

Ultimately — and unhappily for O'Neill — we must enforce the guaranty according to its terms, with the parties' rights "ascertained" from the written text. See <u>First Nat'l Bank of Boston</u> v. <u>Ibarra</u>, 716 N.E.2d 647, 649 (Mass. App. Ct. 1999) (citing

-14-

Merrimack Valley Nat'l Bank v. Baird, 363 N.E.2d 688 (Mass. 1977), and Shawmut Bank, N.A. v. Wayman, 606 N.E.2d 925 (Mass. App. Ct. 1993)). But hang on a minute, says O'Neill, a Massachusetts rule holds that one cannot induce a contract by fraud and then use contractual contrivances to duck liability. See, e.g., Starr v. Fordham, 648 N.E.2d 1261, 1268 (Mass. 1995) (citing Bates v. Southgate, 31 N.E.2d 551 (Mass. 1941), and noting, for example, that "[a]n integration clause in a contract does not insulate automatically a party from liability where he induced another person to enter into a contract by misrepresentation"). True enough. But another rule — the one that holds sway here, for reasons we will discuss in a minute — declares that reliance on supposed misrepresentations that contradict the terms of the parties' agreement is unreasonable as a matter of law and so cannot support a fraudulent-inducement claim. Id. (quoting Turner v. Johnson & Johnson, 809 F.2d 90, 97 (1st Cir. 1986)); accord Masingill v. EMC Corp., 870 N.E.2d 81, 89 (Mass. 2007) (calling this second rule "a rule of long standing"). And as we have just shown, the contract-inducing misrepresentations that O'Neill trumpets are irreconcilably at odds with the guaranty's express terms. To repeat (and we apologize for the monotony of our analysis): O'Neill specifically warranted in the guaranty that he was familiar with the collateral property's value, that the property did not operate as an inducement for him to make the

-15-

uaranty, and that HSBC said nothing to induce him to execute the guaranty — all of which destroys his fraudulent-inducement thesis centered on the project-loan agreement's loan-to-value-ratio provision.[13]  See Starr, 648 N.E.2d at 1268.  He also agreed with the guaranty's tagging him as the primary obligor and with its allowing HSBC to go after him first to recoup the debt — provisions that put the kibosh on his other suggestion that HSBC must first seek recourse against the property.  See id.

Our case bears a striking resemblance to Turner — an opinion mentioned in a case parenthetical above.  Applying Massachusetts law, there we affirmed a lower court's decision rejecting plaintiffs' fraudulent-inducement claims.  See Turner, 809 F.2d at 95-98.  Turner's key facts may be swiftly summarized.

The Turner plaintiffs sold an electronic-thermometer business to defendant for cash considerations and royalties based on future sales.  Id. at 93.  Plaintiffs later claimed that defendant had induced them to sell by misstating various things during negotiations, including that it would promote the thermometer's sale.  Id. at 94.  Importantly, however, the contract's final version stated that defendant had no obligation to market the thermometer.  Id. at 93.  Canvassing the cases, we found

---

[13] By the way, this proviso was a condition precedent to HSBC's providing loan funds to Brandywine, conferring no legally enforceable rights on either Brandywine or O'Neill — as we noted several pages ago.

that "the give-and-take of negotiations would become meaningless if, after making concessions in order to obtain contractual protections, a knowledgeable party" can later "reclaim what it had given away by alleging that it had, in fact, relied not on the writing but on the prior oral statements." Id. at 96.  So we said that Massachusetts's Supreme Judicial Court ("SJC," for short) "undoubtedly would find that the threat to contractual certainty usually would outweigh the possible injustice of denying a claim of fraud."  Id.  We added:

> [T]he [SJC] would reject as a matter of law plaintiffs' fraud claim based on [defendant's] alleged promise to aggressively market [the thermometer].  Certainly in this case, where both parties were experienced in business and the contract was fully negotiated and voluntarily signed, plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue.

Id. at 97.  And we concluded:

> While we do not condone misrepresentations in contract negotiations, we also reject the notion that courts or juries should rewrite a fully negotiated contractual agreement that so precisely sets out the rights and obligations of two sophisticated parties.  We do not believe this rule of law awards undue protection against fraud claims.  It means only that a knowledgeable buyer should not sign a contract that conflicts with his or her understanding of the agreement.

Id. at 97-98. Turner stands on all fours with this case, given that the misrepresentations here are at odds with the guaranty's terms.

Desperate for a way around this reality, O'Neill spends a lot of time trying to convince us that the SJC rejected Turner in McEvoy Travel Bureau, Inc. v. Norton Co., 563 N.E.2d 188 (Mass. 1990). He also believes that the facts of his case fit snugly within McEvoy, which, he adds, obliges us to follow McEvoy anyway. He is wrong on both scores.

The McEvoy defendant, Norton Company, was a huge international conglomerate. 563 N.E.2d at 191. The plaintiff, McEvoy Travel Bureau, Inc., was a small travel agency in Worcester, Massachusetts. Id. For decades McEvoy had provided travel services to Norton, always without a written contract. Id. Eventually the two reached an oral agreement calling for McEvoy to become Norton's exclusive travel agent for all of Norton's Worcester-area business. Id. This would be a "long-term" arrangement, they agreed. Id. Based on this understanding, McEvoy moved into Norton's building and hired extra personnel and bought extra equipment necessary to handle the extra business. Id.

McEvoy had been fully performing under the agreement for two months when Norton sent over a written version of the contract. Id. McEvoy at first refused to sign it, complaining that the document stated that Norton could terminate it on 60 days' notice

and that it was renewable yearly. Id. Norton replied that the termination clause was "inoperative" and "meaningless," a mere technicality added to make its lawyers happy — though at that very time, Norton was secretly considering an "in-house" option that could make McEvoy expendable. Id. at 191-92. An obviously in-the-dark McEvoy signed the contract. Id. at 191.

Three years later, Norton invoked the termination clause that it had previously pooh-poohed as pointless. Id. at 192. Unwilling to let its duper off the hook, McEvoy sued Norton in state court for (among other things) fraud in inducing the contract. Id. at 190. A jury found for McEvoy. Id. And the SJC affirmed, saying, most relevantly, first, that "statements of present intention as to future conduct" — like a fraudulent promise not to use the termination clause — "may be the basis for a fraud action if . . . the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage," id. at 192; and second, that McEvoy's reliance was reasonable, because "the long existing relationship between the parties" entitled it to take Norton's "statements at face value and credit them," id. at 194.

Now back to O'Neill's McEvoy-based arguments. Sure, in reaching its result, the SJC reaffirmed that contracting parties, "whether experienced in business or not, should deal with each other honestly," and that no one should "be permitted to engage in

-19-

fraud to induce the contract" — meaning the SJC saw "no reason to create, as Turner suggests, a new rule or an exception" for cases where the players are considered "sophisticated business enterprises." Id. But McEvoy did not brush off Turner's core holding. And cases after McEvoy have embraced it, agreeing with Turner that "if 'the contract was fully negotiated and voluntarily signed, [then] plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue.'" Starr, 648 N.E.2d at 1267 (quoting Turner, 809 F.2d at 97); see also Masingill, 870 N.E.2d at 89 (same). And despite what he says, our facts look nothing like McEvoy's. For one thing, he identifies no specific statement signifying HSBC's then-present intention that it in the future would treat a contract provision as so much hot air. Cf. McEvoy, 563 N.E.2d at 191. For another, he alleges no history of performance with HSBC that could make his reliance on the complained-of duping conduct reasonable. Cf. id. Given all this, McEvoy offers him no help.

O'Neill, however, has another Massachusetts fraudulent-inducement decision up his sleeve that he says supports his position, this one penned by a state-court trial justice — Linear Retail Danvers #1, LLC v. Casatova, LLC, No. 07-3147, 2008 WL 2415402 (Mass. Super. Ct. June 11, 2008). Linear arose from an alleged default on a commercial lease by defendants-lessees. Id.

at *1.  When defendants signed the lease, they also signed a personal guaranty of the lease.  Id.  Claiming that defendants breached the lease by not paying rent as required, plaintiff-lessor sued them in Massachusetts state court, arguing that they, as guarantors of the rent obligation under the lease, were absolutely liable for the rent owed.  Id. at *1-2.  To fend off plaintiff's summary-judgment motion, defendants argued that plaintiff had drawn them into the lease by falsely representing that it would improve the leased premises in certain ways.  Id. at *3.  The court denied the motion, concluding that "[w]hether these representations were made, and whether, if made, they misrepresented [plaintiff's] actual intentions, are factual issues ripe for determination" by a factfinder.  Id.  But there is a distinction between that case and O'Neill's that makes all the difference:  Linear never says whether the pertinent contract there (the lease) had any provision directly contradictory to the complained-of misrepresentations.  Contrastingly, the pertinent contract here (the guaranty) has plenty of those.  Clearly, then, Linear cannot turn the tide for O'Neill.

The net result of all this is that O'Neill's inducement-based arguments fail.  So we press on.

(b)
Ambiguity

O'Neill also believes that judgment on the pleadings was a no-no because, he says, the guaranty's limitations-on-guaranteed-

-21-

obligations clause is ambiguous on its face.  As a refresher, we note again that this provision (so far as relevant) provides that "[n]otwithstanding anything in this guaranty or any of the loan documents to the contrary," O'Neill's liability under the guaranty "shall be limited to . . . the guaranteed amount," defined as "an amount equal to $8,100,000."  O'Neill sees ambiguity because he thinks that this proviso can either mean that he is responsible for the "first" $8.1 million of the $15.9 million loan (which is HSBC's preferred reading, he says) or the "last" $8.1 million (which is his preferred reading, naturally).

Unfortunately for O'Neill, ambiguity does not arise simply because contracting parties bicker over a provision's meaning, see, e.g., Suffolk Const. Co. v. Lanco Scaffolding Co., 716 N.E.2d 130, 133 (Mass. App. Ct. 1999) — if it did then reducing a contract to writing would give parties "little or no protection," see Fed. Deposit Ins. Corp. v. W.R. Grace & Co., 877 F.2d 614, 621 (7th Cir. 1989) (Posner, J.), making contract drafting a real time-waster.  Instead, ambiguity arises only if a reasonable person could read the provision more than one way.  See, e.g., Brigade Leveraged Capital Structures Fund Ltd. v. PIMCO Income Strategy Fund, 995 N.E.2d 64, 69 (Mass. 2013).  Of course, whether a provision is ambiguous is a question of law that we must answer ourselves, see, e.g., Eigerman v. Putnam Invs., Inc., 877 N.E.2d 1258, 1263 (Mass. 2007), mindful of this:  that we must read the

provision "in the context of the entire contract rather than in isolation," because the interplay between different provisions may cast some light on their meaning, see Gen. Convention of the New Jerusalem in the U.S.A. v. Mackenzie, 874 N.E.2d 1084, 1087 (Mass. 2007), and that a dose of "'[c]ommon sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons,'" see Roberts v. Enter. Rent-A-Car Co. of Boston, 779 N.E.2d 623, 629 (Mass. 2002) (quoting Fishman v. LaSalle Nat. Bank, 247 F.3d 300, 302 (1st Cir. 2001)).

These basic principles spell doom for O'Neill's ambiguity claim. Nothing in the contested provision — or elsewhere in the guaranty, for that matter — limits his guaranty obligation as primary obligor on the note to the "last" $8.1 million of the $15.9 million loan. The clause's language is crystal clear, putting an $8.1 million ceiling on his liability without providing even the faintest whisper of a suggestion that he is responsible only for the loan's final $8.1 million. What O'Neill has done is pull his reading of the provision out of thin air, relying on mental gymnastics inconsistent with the guaranty's actual words (and with common sense). That his interpretation is not plausible wipes out his ambiguity theory. See, e.g., Citation Ins. Co. v. Gomez, 688 N.E.2d 951, 952-53 (Mass. 1998); Mitcheson v. Izdepski, 585 N.E.2d 743, 745 (Mass. App. Ct. 1992).

-23-

## Chapter 93A
## and
## Good-Faith Dealing

We can make quick work of O'Neill's charge that his pleadings alleged enough to push his chapter-93A and good-faith-dealing claims across the plausibility line.  For those not in the know, we point out that chapter 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," <u>see</u> Mass. Gen. Laws ch. 93A, § 2(a), and that courts read a duty of good-faith dealing into every Massachusetts contract, <u>see</u>, <u>e.g.</u>, <u>Harrison</u> v. <u>NetCentric Corp.</u>, 744 N.E.2d 622, 629 (Mass. 2001); <u>Anthony's Pier Four, Inc.</u> v. <u>HBC Assocs.</u>, 583 N.E.2d 806, 820 (Mass. 1991).  Now, as argued on appeal, O'Neill premises these claims on his already-rejected fraud theory, which we state again runs like this:  first, that the 60% loan-to-value ratio in the project-loan agreement is an HSBC representation that it would not need to collect on his guaranty — an entirely false representation, he alleges; and second, that the project-loan agreement's saying that HSBC "can recover" against the collateral property if Brandywine defaults is an HSBC representation that it would proceed against the property rather than against him as guarantor — another entirely false representation, he posits.  But because — as we have explained — his fraud theory fails, so too does his chapter-93A claim.  <u>See</u>, <u>e.g.</u>, <u>Macoviak</u> v. <u>Chase Home Mortg. Corp.</u>, 667 N.E.2d 900, 903

(Mass. App. Ct. 1996) (holding that a litigant cannot succeed on a chapter-93A theory based on a fraud claim that is insufficient as a matter of law).  And because he is not a party to the project-loan agreement between HSBC and Brandywine, his good-faith-dealing claim necessarily fails as well.  See, e.g., Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684 (Mass. 2005) (stressing that "[t]his implied covenant" of good-faith dealing "may not be 'invoked to create rights and duties not otherwise provided for in the existing contractual relationship'" (quoting Uno Rests., Inc. v. Boston Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004))).

Looking to deflect attention from this powerful body of Massachusetts caselaw, O'Neill talks up sections 37 and 51 of the Restatement (Third) of Suretyship and Guaranty, which we will simply call the "Restatement" to save some keystrokes.  As he tells it, both sections bolster his chapter-93A and good-faith-dealing claims.  Not so, we conclude.

Reader alert:  When perusing the next two paragraphs, keep in mind that HSBC here is the "obligee," Brandywine is the "principal obligor," and O'Neill is the "secondary obligor" — at least that is how he sees things.

Broadly speaking, section 37 provides that if an "obligee acts to increase the secondary obligor's risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the principal obligor to bear the cost of

-25-

performance, the secondary obligor is discharged as described in subsections (2) and (3)." See Restatement § 37(1). Subsection (2) allows a discharge if the obligee "releas[es] the principal obligor from a duty other than the payment of money" or "agree[s]" to modify "the duties of the principal obligor that either amounts to a substituted contract or imposes a risk on the secondary obligor fundamentally different" than those imposed before the modification. Id. § 37(2). Subsection (3) provides a list of acts that allow a discharge, but the gist of this subsection is that a discharge is in order if the "obligee" committed "any . . . act or omission that impairs the principal obligor's duty of performance, the principal obligor's duty to reimburse, or the secondary obligor's right of restitution or subrogation." Id. § 37(3). O'Neill is adamant that his case fits section 37 to a T. But he makes no attempt to explain why this is so, alleging nothing showing how HSBC's conduct comes within the ambit of subsections (2) or (3). His argument therefore goes nowhere.[14] See, e.g., Ruiz-Sánchez v. Goodyear Tire & Rubber Co., 717 F.3d 249, 253 (1st Cir. 2013) (stressing that claims "woven entirely out flimsy

---

[14] Sometimes we allow litigants "some latitude" if a plausible claim may be shown "based on what is known," at least where "some of the information needed may be" in the other party's "control." Pruell v. Caritas Christi, 678 F.3d 10, 15 (1st Cir. 2012). But O'Neill does not make this argument. So it is waived. See, e.g., Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011); Ortiz v. Gaston Cnty. Dyeing Mac. Co., 277 F.3d 594, 598 (1st Cir. 2002).

strands of speculation and surmise" do not satisfy the plausibility standard); <u>Morales-Cruz</u> v. <u>Univ. of P.R.</u>, 676 F.3d 220, 225 (1st Cir. 2012) (explaining that "speculation, unaccompanied by any factual predicate, is not sufficient to confer plausibility").

As for section 51, it provides that an "obligee" may be required to liquidate collateral to satisfy a debt when to do otherwise would "result in unusual hardship to the secondary obligor and enforcing the security interest [would] not materially prejudice or burden the obligee or other beneficiaries of the secondary obligation."[15] <u>See</u> Restatement § 51(2)(b). And, building to the ultimate crescendo, he theorizes that "hardship" and "prejudice"/"burden" issues are questions of fact for a jury, not for a judge on a Rule 12(c) motion. Now admittedly, he does say in his pleadings (emphasis ours) that he "will face <u>unusual hardship</u>" if required to pony up the $8.1 million and that HSBC will "not face any hardship, nor be materially <u>prejudiced</u> or <u>burdened</u>" if forced "to first look to" the property "for repayment" of any money owing on the loan. But these are conclusory allegations, simply parroting the legalese of the Restatement without providing any factual support that might give them plausibility. Consequently, we need not credit them.[16] <u>See</u>, <u>e.g.</u>, <u>A.G.</u> v. <u>Elsevier, Inc.</u>, 732

---

[15] Remember, according to O'Neill, HSBC is the "obligee" and he is the "secondary obligor."

[16] O'Neill does not even try to argue that, under the <u>Pruell</u> line of cases, we should cut him some slack because some of the

-27-

F.3d 77, 81 (1st Cir. 2013) (holding that "[w]hen allegations, though disguised as factual, are so threadbare that they omit any meaningful factual content, we will treat them as what they are: naked conclusions" that cannot help a party pass the plausibility test); Shay v. Walters, 702 F.3d 76, 82-83 (1st Cir. 2012) (emphasizing that in deciding "whether allegations cross the plausibility threshold, an inquiring court need not give weight to bare conclusions, unembellished by pertinent facts").

(d)
Undue Influence
and
Unconscionable Contract of Adhesion

The judge rejected O'Neill's undue-influence and unconscionable-contract-of-adhesion claims, concluding that both theories were undone by "O'Neill's sophistication in real estate matters and by the language of the [g]uaranty itself." O'Neill's only complaint about this on appeal is with the "sophistication" comment. To his way of thinking, this remark shows that the judge, when addressing these two claims, considered matters "outside the pleadings" and resolved "credibility" issues against him. See generally Fed. R. Civ. P. 12(d) (declaring that "[i]f, on a motion

_____

facts he needs regarding his "unusual hardship" and HSBC's "prejudice"/"burden" are in someone else's control. For what it is worth, we doubt that he could make that argument on the unusual-hardship issue, particularly since he has within his possession the facts about his personal-financial affairs needed to plead it adequately. Regardless, having failed to make the argument, he has waived it. See, e.g., Rodríguez, 659 F.3d at 175; Ortiz, 277 F.3d at 598.

-28-

under . . . Rule 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and adding that "[a]ll parties must be given a reasonable opportunity to present all material that is pertinent to the motion").  The problem for O'Neill is that <u>his</u> pleadings and the undisputed documents he attached to them showed his real-estate "sophistication."  His counterclaims, for example, played up the "legal[ly] and technical[ly] complex[]" environmental problems that Brandywine navigated in its quest to convert the property to residential use.  And of course he acknowledged in his guaranty that he held an ownership interest in Brandywine.  He also acknowledged there that he had "independently reviewed" Brandywine's financial records and was familiar with the collateral property's value.  If more were needed, Brandywine acknowledged in the project-loan agreement that HSBC had "examined and relied on the experience of [Brandywine] and its general partners, members, [and] principals . . . in owning and operating properties" like the property at issue.  Additionally, O'Neill never tried to support his unconscionability and undue-influence theories by claiming that he was a real-estate <u>un</u>sophisticate.  The bottom line is that we see nothing resembling reversible error here.

## Post-Briefing Letter

By way of a post-briefing letter, see Fed. R. App. 28(j), O'Neill spotlights a lawyer's comment in an article that "[w]hen dealing with a guarantee limited to an amount," a lender "[g]enerally" intends "that the last 'x' dollars be guaranteed" and that the guarantor "may . . . make the argument that his guarantee doesn't kick in until the lender has liquidated its collateral from its primary obligor."  See William Barnett, Limited Guarantees: Variations, Limitations, and Lamentations, 104 Banking L.J. 244, 251 (1987).  But he cites us no case showing that Massachusetts buys into any of this.  Also, "generally" is not the same as "always," see Newman v. Krintzman, 723 F.3d 308, 314 (1st Cir. 2013), and even the article that he clings to stresses that "[t]he parties can, of course, create their own arrangements regarding the order in which the lender will proceed against guarantors or collateral," see Barnett, supra, at 258.  Again, that is precisely what the parties did here, with the guaranty's crystalline words declaring that HSBC is in no way required to move first against the collateral, Brandywine, or others to collect what it is owed.  So the article does nothing to help him.

O'Neill's post-briefing letter also intimates for the first time on appeal that HSBC may have breached some "fiduciary duties" to him.  But the general rule — applicable here — is that issues not developed in a party's opening brief are waived.  See,

e.g., N. Ins. Co. of N.Y. v. Point Judith Marina, LLC, 579 F.3d 61, 71 n.7 (1st Cir. 2009). We say no more about that subject.

(f)
Summing Up

O'Neill floats an array of reasons why the judge stumbled in granting HSBC judgment on the pleadings. But not one can carry the day for him, which is the short of this very long section of our analysis. That leaves his last category of argument — that the judge slipped in denying him leave to replead his defenses and counterclaims — an argument to which we now turn.

**Leave to Replead**

A judge "should freely give leave [to replead] when justice so requires," as O'Neill notes at some length. See Fed. R. Civ. P. 15(a)(2). But a judge may deny leave if amending the pleading would be futile — that is, if the pined-for amendment does not plead enough to make out a plausible claim for relief. See Hatch, 274 F.3d at 19; see also Foman v. Davis, 371 U.S. 178, 182 (1962) (noting that in addition to futility, undue delay, bad faith, and the absence of due diligence on the movant's part may justify denying leave to amend). O'Neill never tells us what further facts he could plead to get around the problems highlighted above. He simply believes that his pleadings as currently fashioned do the trick — a belief that is blown away by the unambiguous guaranty, for the reasons recorded in these pages. In other words, he has not provided (below or here) any additional

-31-

facts which, if repled, would permit him to cross the plausibility threshold when matched up against the guaranty's express language. Consequently, the judge's ruling on this issue stands.  See, e.g., Gray v. Evercore Restructuring L.L.C., 544 F.3d 320, 327 (1st Cir. 2008) (finding futility where the party could not allege anything that could repair the problem in its case).

## FINAL WORDS

Concluding, as we do, that the district judge committed no reversible error, we uphold the judgment that entered below.

**Affirmed, with HSBC awarded its costs on appeal**.