# United States Court of Appeals
## For the First Circuit

No. 13-2009

BRENDON J. LYDON,

Plaintiff, Appellant,

v.

LOCAL 103, INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Howard and Thompson, Circuit Judges,
and Laplante, District Judge.[*]

George P. Fisher, with whom Susan E. Stenger and Burns & Levinson LLP were on brief, for appellant.
Indira Talwani, with whom Ira Sills, Kevin C. Merritt, and Segal Roitman, LLP were on brief, for appellee.

October 24, 2014

[*] Of the District of New Hampshire, sitting by designation.

**THOMPSON, <u>Circuit Judge</u>**.

### Overview

Brendon Lydon believes that his union — Local 103 of the International Brotherhood of Electrical Workers ("Local 103") — runs its hiring hall in a discriminatory way, retaliated against him for complaining about the discrimination, and breached its duty of fair representation. So he sued Local 103 in district court, alleging violations of several federal labor laws. Acting on a motion to dismiss, the district judge resolved the case in Local 103's favor. Lydon appeals. And what follows is our explanation of why we must affirm.

### Background

Because the judge jettisoned the case on a motion to dismiss, we accept the well-pleaded facts in the operative complaint as true, construing them in the light most favorable to Lydon as the nonmoving party. <u>See</u>, <u>e.g.</u>, <u>Schatz</u> v. <u>Republican State Leadership Comm.</u>, 669 F.3d 50, 55 (1st Cir. 2012). Of course, we can supplement these facts with "implications from documents" incorporated by reference into the complaint, "facts" subject "to judicial notice," and "concessions in plaintiff's response to the motion to dismiss." <u>Id.</u> at 55-56 (internal quotation marks and footnote omitted).

At all times relevant here, Lydon has been a member of Local 103, the chartered local of the International Brotherhood of

Electrical Workers ("IBEW[1]").  The IBEW makes and enforces rules governing how locals carry out union activity.  For example, the IBEW publishes what is called a "Pattern Agreement" — a document that sets minimum standards for agreements locals make with their counterparts on the employer side of the employment divide, namely, the local chapters of the National Electrical Contractors Association ("NECA").  Any departure from the pattern agreement's terms requires IBEW-approval.[2]  The IBEW's constitution says pretty much the same thing.[3]  But the IBEW withholds approval if the agreement differs from "Category I Language" in the pattern

---

[1] This is just the first of many acronyms to come.  The reader has our apologies.

[2] The pattern agreement provides:

This Agreement shall be subject to change or supplemented at any time by mutual consent of the parties hereto.  Any such change or supplement agreed upon shall be reduced to writing, signed by the parties hereto, and submitted to the International Office of the IBEW for approval, the same as this Agreement.

[3] The constitution declares:

[Local unions] are empowered to make their own bylaws and rules, but these shall in no way conflict with this Constitution. Where any doubt appears, this Constitution shall be supreme.  All bylaws, amendments and rules, all agreements, jurisdiction, etc., of any kind or nature, shall be submitted to the [IBEW] for approval. No [local union] shall put into effect any bylaw, amendment, rule or agreement of any kind without first procuring such approval.  The [IBEW] has the right to correct any bylaws, amendments, rules or agreements to conform to this Constitution and the policies of the [IBEW]. . . .

agreement.[4]  An example of Category I Language, Lydon says, is the pattern agreement's requirement that locals operate as exclusive hiring halls.  A hiring hall is like an employment agency.[5]  And the adjective "exclusive" means an employer (like the NECA) must hire only through the hall.[6]

The collective-bargaining agreement ("CBA") between Local 103 and the Boston NECA chapter also stated that Local 103 is an exclusive hiring hall.  And for a time Local 103 did in fact function as an exclusive hall, keeping a list of out-of-work members looking for jobs and referring them to the NECA in chronological order (i.e., with the person on the list the longest

---

[4] "Category I provisions," the pattern agreement states,

> are considered Standard Agreement Language by the IBEW International Office and NECA National.  By joint recommendation and in written agreement, all Inside Construction Agreements between IBEW Local Unions and NECA chapters must contain all Category I Language verbatim, i.e. no deviations or changes to these clauses are permitted.  Likewise, the agreement may not contain language that is contrary to the intent of the Category I language or circumvent provisions contained in the Category I language that pertains to but does not conflict with the Category I language.  Additional language that pertains to but does not conflict with Category I language may follow the language, but is not to be inserted in the language. . . .

(Emphasis in original.)

[5] See Local 357, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. NLRB, 365 U.S. 667, 672-73 (1961).

[6] Local 103 "shall be the sole and exclusive source of referral of applicants," the pattern agreement says.

-4-

getting first dibs on an available NECA job).  Members are not required to accept whatever job referral comes their way.  But if they say no more than two times in a row, they are "rolled" back to the bottom of the referral list.

A change occurred in September 2006 when Local 103 and the Boston NECA chapter signed a memorandum of understanding ("MOU") allowing union members to get jobs another way as well: thanks to the MOU, members could now solicit work directly from Boston NECA employers.  This change made Local 103 a nonexclusive hiring hall.  So said Local 103's business manager, Mike Monahan.  Local 103 implemented the MOU without first getting IBEW approval — such approval was not necessary, Monahan told members at a membership meeting.

Lydon asked Local 103 for a copy of the MOU.  But his request fell on deaf ears.  So he turned things up a notch, writing a letter to the IBEW's president complaining about the solicitation system.  And he followed that up with a formal complaint with the IBEW's vice president.  But the IBEW took no action.

In August 2011 Local 103 and the Boston NECA chapter agreed to a new CBA.  Local 103 then sent that document to the IBEW for approval, along with the MOU.  Eventually, Lydon got a letter from the IBEW's president saying that the IBEW had "conditionally approved" the CBA.  The letter, however, did not mention the MOU or the solicitation system.

Sometime before August 2011, Lydon signed onto something called the "Drug Free Program" — a Local 103/Boston NECA program through which members can land jobs with participating employers if they submit to drug testing. But he opted out of the program around the time Local 103 and the Boston NECA reached the new CBA. His reason for doing so was that he had a good spot on the referral list seniority-wise to land a long-term construction job set to open up — a job that did not have a drug-testing component, apparently. Local 103 never got his opt-out information, however, for reasons unknown. And Local 103 later counted his refusal to work for a drug-free employer as his third refusal — even though he was no longer participating in that program. So he ended up back on the bottom of the referral list.

An unhappy Lydon challenged the refusal rule's application to his situation. But Monahan — the person who handled the challenge — would not change the result. "Lydon appealed but was denied," his complaint says — though he does not say there who did the denying. Anyway, Lydon claims that during this same period Monahan told another member appealing a similar decision that the solicitation system was in place because there were "undesirables" like "Lydon" in Local 103. He also told the member "that if your being rolled hadn't happened at the time Lydon was rolled, things could have been different."

Lydon responded by filing charges against the IBEW with the National Labor Relations Board ("NLRB"), alleging that the IBEW had breached its duty of fair representation both by not disclosing requested information about the referral rule and by not representing him regarding referral issues. But the NLRB concluded that he had not shown an unfair-labor practice on the IBEW's part. So off to federal court he went.

Suing Local 103, Lydon's operative complaint — simply called "the complaint" from now on — has four counts. Count 1 alleges that Local 103 infracted the pattern agreement and the IBEW's constitution when it became a nonexclusive hiring hall — a change, count 1 claims, that discriminatorily favors members who solicit work over those who (like him) await referrals through the referral list. What Local 103 has done and is doing, count 1 says, constitutes an unfair-labor practice as defined in the National Labor Relations Act ("NLRA"), see 29 U.S.C. § 158, violating the Labor-Management Relations Act ("LMRA"), see 29 U.S.C. § 185 et seq. Count 2 contends that Local 103 retaliated against him for complaining about the new worker-dispatch system, a violation of the Labor-Management Reporting and Disclosure Act ("LMRDA"), see 29 U.S.C. § 401 et seq., count 2 adds.[7] Count 3 charges that Local

---

[7] A quick "fyi": Congress passed the NLRA in 1935 but amended it in 1947 by enacting the LMRA and amended it again in 1959 by passing the LMRDA. See, e.g., Paige v. Henry J. Kaiser Co., 826 F.2d 857, 862 n.8 (9th Cir. 1987).

103 breached its duty of fair representation by bargaining for the solicitation system, a system that flies in the face of IBEW rules and that Local 103 runs in a discriminatory manner, or so count 3 insists. And finally, count 4 asserts a class-action claim under count 1.

Local 103 later asked the judge to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) or, alternatively, to resolve the case on summary judgment under Fed. R. Civ. P. 56. The judge granted a Rule 12(b)(6) dismissal, holding that Lydon's complaint failed to allege a plausible theory of relief. And that ruling triggered this appeal.

**Standard of Review**

We give fresh review to the judge's Rule 12(b)(6) decision, affirming if — after accepting as true all well-pled facts in the complaint and drawing all reasonable inferences in Lydon's favor — the complaint fails to state a plausible claim. See, e.g., Schatz, 669 F.3d at 55. Merely reciting elements of a claim will not do, obviously. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Nor will alleging facts that "are too meager, vague, or conclusory to remove the possibility of relief from the realm of conjecture . . . ." SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010). One more thing: because the judge's reasoning does not bind us, we are free to affirm his decision on

-8-

any basis supported by the record and the law.  See, e.g., Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 8 (1st Cir. 2013).

With this discussion out of the way, we turn to the issues before us.

## Documents Not Considered

Kicking things off, Lydon argues in his opening brief that the judge abused his discretion by not considering "numerous declarations, documents, and otherwise useful information in opposition" to Local 103's motion to dismiss or for summary judgment.  On a motion to dismiss, he reminds us, quoting from one of our cases, a judge can mull over "documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice."  Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008) (quoting In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 20 (1st Cir. 2003)).  The problem for Lydon is that his initial brief never specifically identifies the "numerous" papers that the judge should have pondered but did not.  And it never explains how these unnamed documents fit within the parameters of Giragosian, let alone explain how they could have pushed his complaint across the plausibility threshold.  Given these circumstances, we hold the argument waived.  See, e.g., HSBC Realty Credit Corp. (USA) v. O'Neill, 745 F.3d 564, 577 (1st Cir. 2014) ("HSBC," from here on out) (stressing that arguments "not developed in a party's opening brief are waived").

-9-

## Count 1:
## The LMRA Claim

Disagreeing with the judge, Lydon insists that he alleged enough to propel his count-1 LMRA claim past mere possibility toward plausibility. That count, we remind the reader, complains that the solicitation system violated the pattern agreement and the IBEW constitution, and operates in a discriminatory fashion to boot. Local 103's actions flout section 185(a) of the LMRA and section 158(b)(2) of the NLRA, count 1 suggests. But unfortunately for Lydon, there is a subject-matter-jurisdiction problem knocking about here.

As relevant to our decision, section 185(a) of the LMRA empowers district courts to hear suits for breach of contract between two labor organizations.[8] See Wooddell v. Int'l Bhd. of Elec. Workers, Local 71, 502 U.S. 93, 95, 98-101 (1991). An international's constitution is a contract between two labor organizations, the international and its local — that is what our

---

[8] Section 185(a) — titled "Venue, amount, and citizenship" — reads:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to citizenship of the parties.

judicial superiors tell us.  See id.[9]  And members can sue to enforce the contract/constitution as third-party beneficiaries.  See, e.g., Wooddell, 502 U.S. at 100-01.  To be fair, count 1's LMRA claim does allege violations of the IBEW constitution.  But — and it is a big "but" — Lydon makes no effort in his brief to flesh out a putative Wooddell claim, supplying no argument or authority, for example, suggesting how or why that claim might work.  So to the extent he could have made such claim, it is waived.  See, e.g., HSBC, 745 F.3d at 577.

Wait, says Lydon, in a post-argument letter, count 1's LMRA claim clearly mentions how Local 103's unfair labor practices discriminated against those who only use the referral system.  True, count 1 does indeed say that.  And we also agree with him that a union commits an unfair labor practice under section 158 when it causes an employer to discriminate in hiring, tenure, or terms of employment either to encourage or discourage union membership.  See 29 U.S.C. § 158(b)(2), (a)(3).  But the NLRB — not the courts — has "primary jurisdiction" over an "action that is arguably subject" to section 158.  Marquez v. Screen Actors Guild, 525 U.S. 33, 49 (1998) (internal quotation marks omitted).  That said, an unfair-representation claim — which targets discriminatory

_____

[9]  See also United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada, AFL-CIO v. Local 334, United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada, 452 U.S. 615, 620-23 (1981).

or arbitrary conduct, see Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 570 (1976) — "is cognizable in the first instance in federal court." Marquez, 525 U.S. at 49. And generously read, the discrimination allegations in count 1's LMRA claim basically mimic the discrimination allegations in count 3's unfair-representation claim. So we can consider count 1's discrimination charges to the extent they sync up with count 3's unfair-representation accusations. And we will do just that shortly when we take on count 3. But first we must deal with count 2.

## Count 2:
## The LMRDA Claim

Lydon believes the judge missed the boat by ruling he had no LMRDA claim under count 2. That count — the reader will recall — alleged that Local 103 "disciplined" him within the meaning of the LMRDA by dropping him to the bottom of the referral list in retaliation for his complaining to the IBEW about the solicitation system. We find no fault with the judge's conclusion, however.

Among its constellation of provisions, the LMRDA guarantees free-speech rights to "[e]very member of a labor organization," see 29 U.S.C. § 411(a)(2); makes it illegal for a union "to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled," see id. § 529 (emphasis added); and permits civil actions to protect his rights, see id. § 412. Critically for our purposes, "discipline" does not "include all acts that deter[] the exercise of rights

-12-

protected under the LMRDA"; rather it "denote[s] only punishment authorized by the union as a collective entity to enforce its rules." Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6, 493 U.S. 67, 91 (1989). Discipline, then, "signif[ies] penalties applied by the union in its official capacity rather than ad hoc retaliation by individual union officers." Id. at 92 n.15. So to state a claim a plaintiff cannot allege simply that "union officers" carried out "personal vendettas" against him, id. at 94 — no, he must allege that he experienced "[t]he opprobrium of the union as an entity," id., with the retaliation resulting from an "established disciplinary process," id. at 91.

None of Local 103's alleged conduct amounts to "discipline," so defined. Yes, a loss of job referrals may possibly be discipline if "imposed" by a union on a member "to punish a violation of union rules." Id. at 92 n.15. And yes, Lydon butted heads with Monahan — the Local 103 business manager who, remember, both upheld the three refusals in Lydon's case and allegedly said the solicitation system kept "undesirables" like Lydon from getting jobs. But nothing Monahan supposedly did or said involved punishment "by the union as a collective entity" or "in its official capacity," to use Breininger's parlance. Sure, the complaint accuses Monahan of using his union position to retaliate against Lydon for complaining about the solicitation scheme. And from that allegation he asks us to conclude that

-13-

Monahan's actions brought the <u>union</u>'s "opprobrium" on him.  But this we cannot do, for an obvious reason:  if every union official's action constituted union action simply because of his position, then the distinction between "ad hoc retaliation by individual union officers" and discipline "imposed by the union as an entity" would vanish.  <u>See</u> <u>id.</u> at 92 n.15.

Perhaps sensing a grave problem with count 2's theory, Lydon says in his opening brief that a "union tribunal" called the "Appeals Committee" — of which Monahan was a member, apparently — actually upheld the three refusals.  And — the argument continues — because the Appeals Committee wielded "the full weight of Local 103's power," the union really disciplined Lydon.  But his complaint itself never mentions the Appeals Committee, much less allege how much union authority the Committee wields.  So his argument does him no good.

Bottom line:  Lydon has issues with Monahan, certainly. And his complaint is thick with personal-vendetta allegations. But he alleges no facts plausibly suggesting action by the union as an entity, to say nothing of union action resulting from an established disciplinary process.  <u>Cf.</u> <u>Linnane</u> v. <u>Gen. Elec. Co.</u>, 948 F.2d 69, 72 (1st Cir. 1991) (finding no discipline for LMRDA purposes where plaintiff did not allege "that the Union as a body in a proceeding formal or informal, deliberately voted" to take the

-14-

complained-of action).  Ultimately, then, count 2 fails the plausibility test.

### Count 3:
### The Fair-Representation Claim

Lastly, Lydon asks us to undo the judge's decision dismissing the fair-representation claim in count 3.  As a refresher, that count accuses Local 103 first of bargaining for a solicitation system that does not jibe with IBEW rules and then of arbitrarily favoring members who use that system over those who don't.[10]  But after working our way through the law and the allegations, we uphold the judge's ruling.

The duty of fair representation requires a union to serve its members "honestly and in good faith and without invidious discrimination or arbitrary conduct."  Hines, 424 U.S. at 570.  A judge-made doctrine, see Breininger, 493 U.S. at 79, the duty applies to "all union activity," including the union's hiring-hall operations, see  Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67, 77 (1991) ("O'Neill," going forward).  A breach occurs when a union treats its members arbitrarily, discriminatorily, or in bad faith.  See, e.g., Marquez, 525 U.S. at 44.  Focusing — as the parties basically do — on arbitrariness, we see that a union's conduct is arbitrary only if it "is so far outside a wide range of

---

[10]  The "arbitrarily favoring" allegation here essentially mirrors the allegation in count 1.  And again, jurisdictionally speaking, we can and do consider both allegations in deciding whether Local 103 breached its fair-representation duty.

-15-

reasonableness . . . as to be irrational," O'Neill, 499 U.S. at 67 (internal quotation marks and citation omitted) — i.e., only if it is without any "rational basis or explanation," Marquez, 525 U.S. at 46. That is a pretty high standard, indeed.

Trying to squeeze his case into this framework, Lydon first plays up how count 3 alleges Local 103's irrationality in negotiating a solicitation system that is 180 degrees away from what the IBEW requires. IBEW rules, he argues, require that Local 103 run an exclusive hiring hall. Yet the MOU between Local 103 and the Boston NECA turned the hall into a nonexclusive one.

Here is the problem, however. A "hiring hall," the high Court tells us, "is a matter of negotiation between the parties." Local 357, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. NLRB, 365 U.S. 667, 676 (1961). Negotiation is the art of compromise, obviously, and human nature being what it is, not every member will love every compromise. Cf. Rakestraw v. United Airlines, Inc., 981 F.2d 1524, 1539-30 (7th Cir. 1992) (Easterbrook, J.) (commenting that "[o]ften unions can achieve more for some of their [members] only by accepting less for others"). But as the members' bargaining representative, Local 103 enjoys "great" discretion in resolving the "competing interests" of its constituents, see Humphrey v. Moore, 375 U.S. 335, 349-50 (1964) — which means judicial review is "highly deferential," precluding judges from second-guessing the union's judgment just for the sake

-16-

of it, See O'Neill, 499 U.S. at 78 (stressing that courts must respect "the wide latitude that negotiators need for effective performance of their bargaining responsibilities").  Now, Lydon does argue in his initial brief that Local 103's negotiated solicitation system represents the height of arbitrary action — because, the theory goes, the system clashes with IBEW rules.  But he cites no authority indicating that a local's decision not to follow its international's preferred referral system falls outside the generous range of reasonableness it has to strike a balance between competing interests when bargaining with employers.  Nor does he offer a convincing explanation of what the law should be in this situation, assuming he unearthed no on-point authority.[11]  And having been raised "in a skeletal form, without citation to any pertinent authority," the argument is waived.  See Muñiz v. Rovira, 373 F.3d 1, 8 (1st Cir. 2004); accord Medina-Rivera v. MVM, Inc., 713 F.3d 132, 140-41 (1st Cir. 2013).

Turning then to the second part of Lydon's fair-representation argument — that the solicitation system arbitrarily discriminates among members — his theory essentially proceeds in four steps.  Step one:  "The MOU apparently allow[s] an exception to the CBA," he writes, "so that union members [can] solicit

_____

[11] In dismissing count 3, the district judge also noted that Lydon cited nothing "whatsoever suggesting that a union breaches its duty of fair representation by operating in a manner that is inconsistent with the rules of its international union."

-17-

employers for employment regardless of their position on the chronological list." Step two:  This exception, he adds, hurts "non-soliciting members" who follow the CBA and the pattern agreement.  Step three:  Given this situation, Local 103 — to again quote his brief — "cannot be afforded a 'wide range of reasonableness' in implementing" that system.  Step four:  And so, he contends, Local 103 is on the hook for violating its fair-representation duty.

We can make short work of this argument, because at bottom we fail to see how Lydon suffered arbitrary discrimination through the solicitation system's creation.  After all, that system is open to every member, even to "undesirables" — his word — like him.  They and he can use either the solicitation system or the seniority system, or both — the "both" option is directly asking Boston NECA employers for work while also trying for referrals through the seniority system.  How to play it is totally up to each member, not Local 103.

Undaunted, Lydon points out that the complaint alleges that Local 103 implemented the solicitation system to roll off "undesirables."  But this argument overlooks that the solicitation system simply lets members solicit work.  It plays no part in kicking members to the bottom of the referral list when they turn down work — members end up at the bottom, remember, when the three-refusal rule applies.  So his point does not persuade.

The net result is that, like his other claims, the fair-representation claim falls short of satisfying the plausibility standard.[12]  And that is that.[13]

## Final Words

Our work over, we <u>affirm</u> the judgment of dismissal and award Local 103 its costs on appeal.  <u>See</u> Fed. R. App. P. 39(a)(2).

So ordered.

---

[12] Relying on <u>Carpenters Local 537 (E.I. Du Pont)</u>, 303 N.L.R.B. 419 (1991) ("<u>Carpenters</u>," for easy reference), Local 103 alternatively argues that as a nonexclusive hiring hall it owes its members no duty of fair representation.  The judge below found <u>Carpenters</u> convincing.  But that is the only time a judge anywhere in the country has ever cited <u>Carpenters</u>, Lydon fires back.  And to his mind, <u>Carpenters</u>'s analysis is not compelling here.  Today is not the day to decide whether to embrace <u>Carpenters</u>, because even <u>assuming</u> (without deciding) that Lydon is right about that case, he still loses for the reasons arrayed above.

[13] Our ruling means that Lydon's class-action claim is a no-go too.